**Timothy BROWN, Petitioner,**

v.

**James V. CROSBY, Jr., as Secretary of the Department of Corrections,[1] Respondent.**

**No. 95–CV–7207.**

United States District Court,
S.D. Florida.
Miami Division.

March 19, 2003.

---

1. On February 13, 2003, James V. Crosby, Jr., the current Secretary of the Department of Corrections, was substituted as the Respondent in this case, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

Timothy Brown, [Pro Se], Avon Park, FL, Brenda Greenberg Bryn, Timothy Day, Federal Public Defender's Office, Fort Lauderdale, FL, for Timothy Brown, plaintiff.

Celia Ann Terenzio, Leslie T. Campbell, Office of the Attorney General, West Palm Beach, FL, for Secretary for the Department of Corrections, James V. Crosby, Jr., Attorney General, defendants.

## ORDER

GRAHAM, District Judge.

**THIS CAUSE** comes before the Court upon Petitioner's Amended Petition for Writ of Habeas Corpus (D.E.70).

**THE COURT** has considered the Petition, the pertinent portions of the record, and is otherwise duly advised in the premises.

## BACKGROUND

This case involves the rare and extraordinary occasion where a petitioner in state custody has prevailed on a claim of "actual innocence," as that legal term is defined in the Supreme Court's decision in *Schlup v. Delo,* 513 U.S. 298, 316–321, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). On September 9, 2002, after conducting lengthy evidentiary hearings in the matter, this Court determined that Petitioner Timothy Brown ("Brown") demonstrated that no reasonable jury would have found him guilty beyond a reasonable doubt of the first-degree murder of Broward Sheriff's Deputy Patrick O. Behan, had it heard the competent evidence presented during the federal habeas proceedings. *See Brown v. Singletary,* 229 F.Supp.2d 1345 (S.D.Fla. 2002).

In its September 9, 2002 Order, the Court recognized that its finding of "actual innocence" does not automatically entitle Brown to habeas relief, as the purpose of a federal habeas corpus proceeding is not to review or correct errors of fact, but to ensure that individuals are not imprisoned in violation of the U.S. Constitution. *See Herrera v. Collins,* 506 U.S. 390, 400–01, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993). As the Supreme Court has made clear, "what we have to deal with [on habeas review] is not the petitioners' innocence or guilt but solely the question whether their constitutional rights have been preserved." *Moore v. Dempsey,* 261 U.S. 86, 87–88, 43 S.Ct. 265, 67 L.Ed. 543 (1923). Thus, the Court's determination of "actual innocence" merely "opened the gateway" for the Court to consider the merits of Brown's constitutional claims, including those claims which were otherwise procedurally barred. *Schlup,* 513 U.S. at 316, 115 S.Ct. 851; *Brown,* 229 F.Supp.2d at 1361. It is these constitutional claims to which the Court now turns.

Brown was convicted in Broward County, Florida in 1993 as a principal to first-degree murder, in large part based on his statement to police that he was with co-defendant Keith King, when Keith King allegedly shot Deputy Behan. Brown, who was fourteen years old at the time of Deputy Behan's death and fifteen years old at the time of his arrest, was tried as an adult and sentenced to life imprisonment without possibility of parole on November 19, 1993. *See Brown,* 229 F.Supp.2d at 1350–51. Keith King, who was seventeen years old at the time of the murder, pleaded guilty to manslaughter and was sentenced to fifteen years imprisonment, and has since been released. *Id.*

The Court notes that the extensive factual and procedural background of this case is more fully set forth in the Court's September 9, 2002 Order, and need not be revisited here. *See Brown,* 229 F.Supp.2d at 1347–1352. However, one preliminary procedural matter merits clarification. On September 22, 2000, the Court dismissed without prejudice Brown's "unexhausted" claims, and directed Brown to file an amended petition containing only those claims which were exhausted. Brown complied with the Court's directive by filing his Third Amended Petition, which asserted only his "exhausted" claims.

Thereafter, in its September 9, 2002 Order, the Court found that Brown's unexhausted claims were procedurally defaulted, and that the merits of those claims were properly before the Court and could

be considered as grounds for relief given Brown's demonstration of "actual innocence." *Brown*, 229 F.Supp.2d at 1364–1368. The parties have since fully litigated and briefed *all* of the claims in the Amended Petition, including the "unexhausted" claims which were previously dismissed without prejudice. Accordingly, because the merits of the claims in the Amended Petition are properly before the Court, and there is no prejudice to either party as the issues have been fully briefed, the Court herein conforms the pleadings to the evidence and reinstates the Amended Petition *nunc pro tunc.*

In the Amended Petition, Brown asserts a number of constitutional claims. Brown maintains that his fifth and fourteenth amendment rights to due process of law were violated because he was incapable of knowingly and intelligently waiving his *Miranda* rights, and because his confession was coerced and not voluntarily given. Brown also asserts that he was convicted in violation of due process of law due to the insufficiency of the evidence introduced against him at trial. Brown further contends that his right to due process was violated by the trial court's erroneous "misinstruction" to the jury at the beginning of trial as to the sentence he faced if convicted. In addition, Brown argues that his sixth and fourteenth amendment rights were violated by denial of the effective assistance of trial counsel in the investigation of the case, litigation of the motion to suppress, and the conduct of trial. Finally, Brown submits that he received ineffective assistance of appellate counsel.

## STANDARD OF REVIEW UNDER 28 U.S.C. § 2254 (1995)

■ Another preliminary matter involves the statutory framework which this Court should apply to Brown's habeas petition, which was initially filed in 1995, before significant revisions to the habeas corpus statute came into effect pursuant to

the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. 104–132, 110 Stat. 1214 (1996). In many respects, the AEDPA significantly limits habeas corpus review and provides for much greater deference to state court findings than provided by the pre-existing habeas statute. However, because Brown's petition was filed before the effective date of the AEDPA, the Court finds, and the parties agree, that the AEDPA's provisions do not apply here.

The pertinent provision of the "pre-AEDPA" habeas statute, codified at 28 U.S.C. § 2254(d)(1995), requires a federal court to apply a presumption of correctness to certain state court findings of fact. Specifically, the statute provides:

> In any proceeding instituted in Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue ... shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit— [that any one of the eight enumerated exceptions to the presumption of correctness applies].

*Id.*

As the express terms of the statute make clear, a "presumption of correctness" applies only to state court factual findings made after a hearing on the merits of the factual issue, and then again, only if none of the eight (8) enumerated exceptions apply. The possible statutory exceptions in this case include 28 U.S.C. § 2254(d)(3) and (8), which provide that the presumption of correctness does not apply if the petitioner proves or if it shall otherwise appear:

> (3) that the material facts were not adequately developed at the State court hearing;

(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record.

28 U.S.C. § 2254(d)(3) and (8).

Beyond codifying the presumption of correctness accorded to state court factual findings and the enumerated exceptions, the statute provides that a habeas petitioner may rebut any presumption with "convincing evidence" at an evidentiary hearing. As the final paragraph of 28 U.S.C. § 2254(d)(1995) sets forth:

> In an evidentiary hearing in the proceeding in the Federal court, when due proof of such factual determination has been made, unless the existence of one or more of the circumstances respectively set forth in paragraphs numbered (1) to (7), inclusive, is shown by the applicant, otherwise appears, or is admitted by the respondent, or unless the court concludes pursuant to the provisions of paragraph numbered (8) that the record in the State court proceeding, considered as a whole, does not support such factual determination, the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous.

*Id.* Thus, to the extent any presumption or correctness does apply, Brown would then have the opportunity to rebut any such presumption by establishing through "convincing evidence that the factual determination made by the state court was erroneous." *Id.*

The types of findings to which the presumption applies are those of "basic, primary, or historical facts" underlying a constitutional claim. *Townsend v. Sain,* 372 U.S. 293, 309 n. 6, 83 S.Ct. 745, 9 L.Ed.2d 770(1963). The presumption also applies to credibility determinations. *See Williams v. Johnson,* 845 F.2d 906 (11th Cir.1988). The statutory "presumption" does not apply, however, to conclusions of law, or even to mixed questions of law and fact. *See Cuyler v. Sullivan,* 446 U.S. 335, 341–342, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980).

## DISCUSSION

As this Court has previously noted, there was no physical evidence or eyewitness testimony linking 14 year-old Brown to the death of Deputy Behan, nor was any evidence of a motive to commit murder ever presented to the jury. *See Brown,* 229 F.Supp.2d at 1350. Instead, the State's case largely revolved around the statement made by Brown to Broward Sheriff's Office ("BSO") detectives on July 16, 1991. *Id.*

Given that Brown's statement was the only meaningful evidence introduced against him, the Court will first examine Brown's claim, set forth as Ground C of the Amended Petition, that Brown was denied his fifth amendment right to due process by the admission of his confession, because he did not knowingly and intelligently waive his rights on July 16, 1991 in accordance with *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

## I. BROWN'S CLAIM THAT HE DID NOT KNOWINGLY AND INTELLIGENTLY WAIVE HIS RIGHTS

It is well-settled that in *Miranda v. Arizona,* the Supreme Court held that in order to protect an accused's Fifth Amendment privilege against self-incrimination during the inherently coercive custodial

interrogation setting, certain procedural safeguards must be employed. As a general matter, the Court held that an individual taken into police custody and subjected to questioning must be warned that "he has a right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney, one will be appointed for him prior to any questioning if he so desires." *Miranda,* 384 U.S. at 479, 86 S.Ct. 1602.

With regard to the right to the presence of an attorney, the Court in *Miranda* expressly recognized the importance of informing a suspect of his right to have an attorney present during questioning. "[T]he right to have counsel present during interrogation is indispensable to the protection of the Fifth Amendment privilege under the system we delineate today." *Id.,* 384 U.S. at 469, 86 S.Ct. 1602. As the Court elaborated:

> [W]e hold that an individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation under the system for protecting the privilege we delineate today. As with the warnings of the right to remain silent and that anything stated can be used in evidence against him, this warning is an absolute prerequisite to interrogation. No amount of circumstantial evidence that the person may have been aware of this right will suffice to stand in its stead. Only through such a warning is there ascer-

tainable assurance that the accused was aware of this right.

384 U.S. at 471–472, 86 S.Ct. 1602.

## A. Standard for Evaluating Whether a Defendant's Waiver of Miranda Rights Was Valid

*Miranda* itself provides that a suspect may waive his *Miranda* rights, but must do so "voluntarily, knowingly and intelligently." *Miranda,* 384 U.S. at 475, 86 S.Ct. 1602. A court considering a waiver of *Miranda* rights conducts a two-pronged inquiry under a totality of the circumstances standard. *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).[2]

First, a court considers the voluntariness of the statement, and whether the waiver was the product of a free and deliberate choice rather than intimidation, coercion or deception. *Moran,* 475 U.S. at 421, 106 S.Ct. 1135. Second, a court considers the separate and distinct question of whether the waiver was "knowingly and intelligently" made. *Id.*

■ A waiver of *Miranda* rights is "knowingly and intelligently" made if it is "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Id. See also Smith v. Zant,* 887 F.2d 1407, 1430 (11th Cir.1989) (en banc) (Kravitch, J.) (the Constitution requires "that the defendant know what he is waiving *and* the consequences of his decision").

■ For purposes of a knowing waiver, a defendant need not understand "all the complexities of his fifth amendment rights and of the implications of a decision to

The standard for a waiver of a constitutional right was first articulated in *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), where the Court explained that waiver is "an intentional relinquishment or abandonment of a known right or privilege.

The determination of whether there has been an intelligent waiver ... must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Id.* at 464, 58 S.Ct. 1019.

waive those rights." *Id.* As Judge Kravitch explained in *Smith:*

> [A] court need only inquire into whether the defendant understood that he had a right "not to talk to law enforcement officers, to talk only with counsel present or to discontinue talking at any time," and that "whatever he chooses to say may be used as evidence against him."

*Id.* (quoting *Colorado v. Spring,* 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987)).

■ The Supreme Court has explained that the "totality of the circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved." *Fare v. Michael C.,* 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979). This approach includes evaluation of the juvenile's age, experience, education, background, and intelligence, and allows courts "to take into account those special concerns that are present when young persons, often with limited experience and education and with immature judgment, are involved." *Id.*

■ In addition, a suspect's limited intellectual ability factors significantly into the determination of whether there is a valid waiver. *See, e.g., Cooper v. Griffin,* 455 F.2d 1142, 1145 (5th Cir.1972)[3]; *Henry v. Dees,* 658 F.2d 406 (5th Cir.1981). For instance, in *Cooper,* the former Fifth Circuit held invalid the waivers given by two juveniles with IQs between 61 and 67, who read at a second-grade reading level. *Id.* at 1144–45. The court in *Cooper* underscored the importance of considering a juvenile's mental ability as it relates to waiver:

> The requirement of "knowing and intelligent" waiver implies a rational choice

based upon some appreciation of the consequences of the decision.... Here [the defendants] surely had no appreciation of the options before them or of the consequences of their choice [to sign waivers]. Indeed it is doubtful that they even comprehended all of the words that were read to them. Thus, they could not have made a "knowing and intelligent" waiver of their rights.

*Id.,* at 1145. *See also Smith v. Zant,* 887 F.2d at 1430 (affirming grant of writ of habeas corpus on ground that defendant with IQ of 65 and mental age of 10 did not knowingly and intelligently waive rights); *United States v. Garibay,* 143 F.3d 534 (9th Cir.1998) (defendant's borderline retardation and inability to understand oral instructions among prerequisite skills for knowing and intelligent waiver).

■ It is the State's burden at a suppression hearing to prove that the defendant understood his *Miranda* rights and the consequences of waiving them. However, in a habeas proceeding, the burden shifts to the habeas petitioner to prove—by a preponderance of the evidence—that his purported waiver of rights was ineffective. *See Lindsey v. Smith,* 820 F.2d 1137, 1149 (11th Cir.1987).

Having set forth the relevant § 2254 framework and the law under *Miranda* and its progeny, the Court now turns to a careful review of the trial court record to determine whether the trial court committed constitutional error in admitting Brown's July 16, 1991 taped statement at trial.

### B. *The State Court Record*

The trial court conducted a pre-trial hearing on Brown's motion to suppress his November 15, 1990 and July 16, 1991

---

**3.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981), en banc, the Eleventh Circuit Court of Appeals adopted as binding precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981.

statements to BSO. The parties correctly advised the trial court that the burden of proof with respect to the admissibility of those statements rested with the State. Pet. Ex. 1006(A) at 4–5.[4] Only the July 16, 1991 statement is at issue here, as the trial court ultimately suppressed the November 15, 1990 statement, but permitted the July 16, 1991 statement to stand.

When Brown gave his first statement on November 15, 1990, Brown was not a suspect in the Behan murder case at that time, and the detectives conducting the interview considered it only to be a witness statement. As such, Brown was not given any *Miranda* warnings on November 15, 1990.

During the interview, Brown stated that Keith Maddox shot Deputy Behan, but then recanted and stated that he himself shot Deputy Behan. *Id.* at 19. As Brown continued to talk, Sergeant Scheff noted that Brown would start a statement and then jump to something else, was not responsive, and exhibited a "bizarre quality" that gave Scheff "the distinct impression that [Brown] was very much under the influence of narcotics." *Id.* at 19–20. At that point, Sergeant Scheff declined to proceed further because he "did not believe in good faith [he] could give [Brown] his rights and expect that he could waive them because he seemed very, very high." *Id.* at 21. Sergeant Scheff also explained that "I didn't know how much of what I had seen on November 15th was the product of intoxication due to cocaine from crack cocaine usage, [or] if any of it was some organic brain dysfunction." *Id.* at 31. At the very least, Sergeant Scheff had no doubt that "clearly he was not in possession of all his faculties." *Id.* at 125.

Further, in his deposition and at the suppression hearing, Sergeant Scheff stat-

ed that he was concerned that Brown was "like clay" in his hands. *Id.* at 124–126. For his part, Sergeant Scheff attempted to clarify this statement and testified at the suppression hearing as follows:

> I said I wanted to resolve the circumstance, where I was comfortable that we are going to come to true resolution and not get a statement from him, because he was like clay and I could get him to say whatever I wanted him to. Do you understand what happened? I wanted to know at the end of Tim Brown's interview that Tim Brown confessed. I wanted to know in my heart that he was the one that did it.

*Id.* at 126.

Sergeant Scheff did not believe Brown's statement on November 15, 1990, and thus did not arrest Brown at that time, believing Brown to be "a confused kid." *Id.* at 127–129. Rather, after the November 15, 1990 interview, Brown was transported to HRS custody pursuant a juvenile pick-up order in an unrelated juvenile matter. *Id.* at 23. Sergeant Scheff testified that he did not wish to re-interview or arrest Brown while he was in HRS custody, because "it has been my experience that very often what happens is that HRS workers invoke the rights of the juveniles, and we had to get an opportunity to speak to him." *Id.* at 26.

The Broward State Attorney's office kept BSO apprised of Brown's situation in the Juvenile Detention Center, and BSO monitored Brown's whereabouts in order to proceed with the plan to interview him. *Id.* at 31; Pet. Ex. 1006(B) at 267–268.

Months later, on the morning of July 16, 1991, the Broward State Attorney's office contacted Detective Carr and advised him

---

4. The complete transcript of the state court proceedings in *State of Florida v. Timothy Brown,* Case No. 91–14793 CF10B, is set forth in Petitioner's Ex. 1006(A) through 1006(Q).

that Brown would be released from the Juvenile Detention Center that day and would await further placement at the Covenant House in Fort Lauderdale, Florida. *Id.* at 268. Detectives Carr and Thomasevich then went to the Covenant House, and waited outside for Brown for about half an hour. *Id.*

Brown was indeed released from the Juvenile Detention Center on July 16, 1991, and predictably just as Brown left the Covenant House and was away from HRS workers, Brown was immediately located by BSO detectives in the vicinity of the Covenant House and arrested for the murder of Deputy Behan at around 6:20 p.m. *Id.* at 27–34. Detective James Carr placed Brown in the police car, at which time Detective Carr informed Brown of his *Miranda* rights by reading verbatim the following rights from the BSO's standard issue card, as follows:

> You have the right to remain silent. You can refuse to answer questions. Anything you say can be used and will be used against you in a court of law. You have the right to speak to an attorney and have him here with you *before* the police ask you any questions. If you cannot afford an attorney, one will be appointed for you before we ask you any questions. Do you wish to have an attorney? *If you decide to answer questions now without an attorney present, you will give up the right to stop answering questions until you speak to an attorney.* Have you ever had an attorney or any law enforcement officer prior to this? Are you willing to answer questions without an attorney?

Pet Ex. 1006(B) at 272–273 (emphasis added). Detective Carr testified that Brown acknowledged his rights and did not wish to have an attorney, stating "no, not at that time." *Id.* at 273. Detective Carr said he asked Brown "have you ever had an attorney or any law enforcement officer

prior to this," and Brown "acknowledged with a 'No.'" *Id.*

Brown was not questioned during transport to the police station, and arrived at the parking lot of the police station at 6:55 p.m. *Id.* at 276–277; Pet. Ex. 1006C at 367–68. Brown was allowed to use the restroom and was situated in an interrogation room. *Id.* Once there, Brown was given a soda, and Detectives Carr and Thomasevich shackled his feet with leg irons. Pet. Ex. 1006(B) at 281–282; Pet. Ex. 1006C at 403. Detective Carr also testified that he and Detective Thomasevich left the room at one point in time. Pet. Ex. 1006(B) at 274–75.

Detective Carr then read Brown his rights from a Juvenile Statement of Rights form, and Brown filled in responses to questions on the form. The Juvenile Statement of Rights form advised Brown as follows:

> You have the right to remain silent, that is, you don't have to talk to me or answer any questions if you don't want to. Do you understand?
>
> You have the right to talk to an attorney and have him here with you before we ask you any questions. Do you know what an attorney is? Do you understand?
>
> If you can't afford an attorney and you want one, we will get an attorney for you before we ask you any more questions. Do you understand?
>
> If you decide to answer my questions now without an attorney present, you will still have the right to stop answering my questions at any time until you talk to an attorney. Do you understand?
>
> Should you talk to me, anything you say can and will be used in a court of law, either for you or against you. Do you understand?
>
> Are there any questions?

Knowing and understanding your rights, are you willing to answer my questions without an attorney here?

Pet. Ex. 89 (emphasis added). *See also* Pet. Ex. 1006(B) at 276 (rights waiver form admitted into evidence as State's Exhibit A). Brown signed the form and thereby executed the waiver of his rights by 7:10 p.m., less than fifteen minutes after arriving at the station. *See* Pet. Ex. 89.

At the suppression hearing, Brown presented the testimony of Dr. Elizabeth Koprowski, a clinical psychologist, who testified as an expert following the parties' stipulation concerning her expert qualifications. Pet. Ex. 1006(B) at 180–240. Dr. Koprowski testified that Brown, who was fifteen at the time of his arrest on July 16, 1991, was mildly retarded,[5] with a full-scale IQ of 56, thereby placing him, intelligence-wise, in the lowest 1% of our population. *See* Pet. Ex. 1006(B), at 180–190.[6]

Specifically, Dr. Koprowski testified that she administered standard individual IQ tests to Brown, and that his verbal IQ was 58, his non-verbal IQ was 54, and that his full-scale IQ was 56. *Id.* at 185. Dr. Koprowski also testified that she reviewed Brown's school records from 1988, which revealed a similar IQ score in the mentally retarded range. *Id.* at 182.

Dr. Koprowski clarified that although Brown was 15 and in the eighth grade in the Broward public school system, his reading and writing capability was at the third grade level. *Id.* at 188. Brown's mathematical ability was even worse, and was *below* the third grade level. *Id.* at 189.

Dr. Koprowski also administered a psychological test, which indicated that while Brown showed no signs of major mental illness, his responses were "very youthful, not something that a fifteen year old of average intelligence would do, but definitely someone of lower intelligence, very child-like, best way to describe him." Pet Ex. 1006(B) at 189. Dr. Koprowski testified that she believed Brown could be "easily led by almost anybody." *Id.* at 191.

Dr. Koprowski stated that Brown's mental retardation makes him potentially educable, "but not someone who's going to learn in the school system on his own. He would need special education. For example, he is always going to need some special help." *Id.* at 188. Dr. Koprowski further testified that Brown would have the potential ability to understand legal rights in only a "very, very basic way." *Id.* at 190. By this, Dr. Koprowski opined that Brown would understand "in a very basic way, yes, that the lawyer was on his side." *Id.* at 231. However, she concluded that "based on his prior experience, [Brown] did not fully understand that he

---

**5.** As Dr. Walker clarified during the federal habeas proceedings: "Mildly retarded, by the way, doesn't mean what the English translation means. It is a term of art that a psychologist uses.... Mildly retarded is pretty severe. You can't learn in a regular classroom if you are mildly retarded. But it differentiates from moderate or severely retarded people that can't be left alone." *See* Pet. Ex. 1048 at 54.

**6.** As this Court noted in its September 9, 2002 Order, an IQ is determined by taking the Wechsler Adult Intelligence Scales test, the standard instrument for assessing intellectual functioning. The test measures an intelligence range from 45 to 155. The mean score of the test is 100, which means that a person receiving a score of 100 is considered to have an average level of cognitive functioning. *See Brown*, 229 F.Supp.2d at 1349. An IQ between 70 and 75 or lower "is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition." *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 2245 n. 5, 153 L.Ed.2d 335 (2002). As discussed more fully below, the trial court found that Brown's IQ score was between 54 and 58, well within the mentally retarded range.

could have an attorney present." *Id.* at 191.

The State, in cross-examining Dr. Koprowski, offered evidence of Brown's school records over the years, which generally indicated that Brown performed extremely poorly in school. *Id.* at 205–240. For instance, Brown's school records reveal that he was not promoted every year, and that when he was 11 years old, at a time when Brown should have been in the fifth grade, Brown was still in the third grade. *Id.* Even after being held back in school, Brown's performance was *still* below average. *Id.* The State, however, did highlight certain school records indicating that in some instances, Brown's grades were average or even above average. *Id.* at 205–240. However, the State offered no evidence to suggest what standards were used to determine those grades or to otherwise measure his performance on those instances, and offered no evidence to suggest what, if anything, Brown was actually taught in school.[7]

In addition, the school records also reveal Brown's very poor attendance at school, which in certain years reached such a level that Brown was not in compliance with Broward County School attendance requirements. *Id.* at 206. In third grade, for instance, Brown missed 52 days, nearly one-third of the school year. In fourth grade, Brown missed 44 days. *Id.* at 211–212. While the State appeared to argue that the reason for Brown's poor performance in school was his poor attendance, Dr. Koprowski explained that Brown's poor attendance is consistent with his mild mental retardation, because "many students who are not able to keep up with the work and are slipping behind not only lose their motivation to go to school, but they are afraid to go to school because they are humiliated, embarrassed or bored." *Id.* at 207.

In his closing argument, the prosecutor conceded that he was not trying to impeach Dr. Koprowski's testimony concerning Brown's IQ level, because Brown "has scored on several tests over different periods of time at this particular level." Pet Ex. 1006C at 421. Similarly, the trial court found that the state did not impeach Dr. Koprowski. *Id.* at 442. Further, the trial court specifically found that "for the purposes of this hearing, the IQ is between 54, 58." *Id.* at 416.

In addition, the trial court made the following additional findings:

> As I look over this case I see that initial statement made by the Defendant on November 15th is more troublesome to this Court than appears to be to [the State]. And as far as this, as far as this motion pertains to the statement by Mr. Brown on November 15th is concerned the Court will grant that motion.
>
> Now we go on to the statement made on July 16th, is it . . . .
>
> There has to be some independent way that the police will make it back to Mr. Brown on that date. Other than that particular statement made on November 15th. Some of the things that I thought were significant were things such as the fact that the police allowed Mr. Brown to be free at one point to go into (sic) the system here, and be let out again. As a matter of fact, I think it happened a couple of times once at least without their knowing, and I find it very difficult to believe that if they really had him as a suspect based upon that first statement, that he would have had such an opportunity. I think there are, howev-

---

7. Dr. Koprowski also pointed out that many of Brown's grades indicated that Brown received all F's, and noted that the school records concerning Brown's IQ score in 1988 were consistent with her examination three years later in 1991. *Id.* at 239.

er, some problems perhaps for the State regarding the overall facts, and perhaps there will be some difficulty before the jury regarding certain matters such as Mr. McGill and the lack of pursuing Mr. McGill is troublesome to the Court.

What I have to determine in my own mind is does it effect this particular motion, and I've come to the conclusion that it does not. I find that the intelligence of the Defendant being certainly a consideration for the Court as are a number of things, I think it was the *Brewer* case in fact cited in your motion, Counsel, brings the totality of the circumstances to the forefront as well as any individual case, and I'm looking at cases here such as *Stokes* where I'm concerned about the parent going to the police station and not having an opportunity to be with the defendant. I failed to find that particular fact in this case that would conform to, or have this Court conform to the ruling in *Stokes versus State*. And the intelligence certainly I think is relevant, and in some other cases referring to children as young as ten years old IQ's may be a little bit higher I think 68, 69, 70 someplace in that area, but it was a ten year-old as opposed to a 15 year old, and that wasn't sufficient enough to suppress the statement.

Although as you mentioned, Counsel, the State did not impeach the doctor, the fact is that I think much of what she said led the Court to believe this defendant had the mental capacity to understand the Miranda warnings that were given to him, and much of what he did not do well in school may have in fact been brought about by his not attending. . . .

That's not a problem here again that this Court needs to address. It appears clear that in the first statement [Petitioner] was intoxicated and I see nothing in the statement that drugs were mentioned in *Brewer*. I see nothing in the second statement that shows signs of that at all. I believe that the defendant freely and voluntary (sic) and knowingly and intelligently waived his rights in the second statement, and as such this Court would rule that the motion in regards to the July statement be denied.

*Id.* at 441–443. Subsequently, at the jury trial, the trial court denied Brown's request for reconsideration of the issue, and without making any additional factual findings, reaffirmed the decision denying the motion to suppress the July 16, 1991 statement. Pet. Ex. 1006(L) at 1626–1627.

### C. *Analysis Under 28 U.S.C. § 2254(d).*

In its 154–page closing argument brief, the State did not reference the terms of § 2254 or its enumerated exceptions. Instead, the State argues that Brown has failed to show that the trial court's findings are not supported by the record, and that this Court "must afford the trial court's factual conclusions a presumption of correctness." D.E. 333, at 21.

■ As evidenced above, the trial court made no detailed factual analysis of his findings concerning Brown's actual understanding of his *Miranda* rights and of the consequences of waiving those rights. Further, although the Juvenile Statement of Rights form utilized by BSO to advise Brown of his *Miranda* rights was admitted into evidence during the suppression hearing, (Pet.Ex. 1006(B) at 272–276), the trial court made no findings concerning the adequacy of the warnings given to Brown.

At most, in terms of factual findings relevant to the "knowing and intelligent" waiver analysis, the trial court found that (1) Brown's IQ was "between 54, 58" (Pet. Ex. 1006C at 416); (2) "the State did not impeach the doctor"; (3) Brown's "not doing well at school may have in fact been

brought about by his not attending"; (4) Brown was not intoxicated or using drugs on July 16, 1991; and (5) Brown "had the mental capacity to understand the *Miranda* warnings that were given to him." *Id.* at 441–443.

In terms of mixed findings of law and fact, or conclusions of law, the trial court found that (1) in certain unspecified cases, the statements of juveniles younger than Brown but with IQ's a "bit higher, I think 68, 69, 70 someplace in that area" were not suppressed; and (2) Brown freely and voluntary (sic) and knowingly and intelligently waived his rights. *Id.* These two findings, however, are at most mixed findings of law and fact, and are not entitled to any "presumption of correctness" by a federal habeas court, as the ultimate question of the validity of a suspect's waiver of his *Miranda* rights is "a legal question requiring an independent federal determination." *Miller v. Fenton,* 474 U.S. 104, 106, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985).

### 1. The Trial Court Record Concerning Brown's Sub–Normal IQ and Sub–Normal Performance at School Weighs Against a Valid Waiver

As set forth above, the trial court specifically found that Brown's IQ was "between 54, 58" and agreed with Dr. Koprowski's testimony in that regard. Pet. Ex. 1006C at 416. This factual finding is entitled to the presumption of correctness.

While the trial court expressly found that Brown's IQ was between 54 and 58, the trial court for some inexplicable reason refused to consider the effect of Brown's IQ in its legal analysis when it stated that "I'm not accepting any implication that might involve this defendant in terms of that IQ." *Id.* at 416. Of course, while the trial court's subsidiary and historical factual finding of Brown's extremely low IQ level is entitled to a presumption of cor-

rectness, this Court is not bound by the manner in which the trial court applied (or refused to apply) those facts to the governing law.

The State argues that "[t]here can be no question, the trial court's rejection of Dr. Koprowski's assessment of Brown's IQ, as it related to the confession, is supported by the record and the fact that Brown did not attend school on a consistent basis and apply himself while there." D.E. 333, at 40. The Court, however, does not agree the trial court *rejected* Dr. Koprowski's testimony concerning Brown's IQ, when it specifically adopted that crucial testimony and found that Brown's IQ was "between 54, 58." Pet. Ex. 1006C at 416.

The State also argues that the trial court made some sort of factual finding when it found that "much of what he did not do well in school may have in fact been brought about by his not attending." *Id.* at 443. However, while the trial court appeared to somehow suggest that Brown's failure to attend school may have resulted in his low IQ and poor performance at school, the issue of *why* Brown had a low IQ has no credible relevance or bearing to the issue of whether Brown actually understood his rights as they were explained on July 16, 1991. Instead, what *is* relevant is the undisputed fact of Brown's sub-normal IQ, sub-normal performance at school, and sub-normal attendance. If anything, the fact that Brown did not do well in school and did not attend school is consistent with Dr. Koprowski's testimony and makes it even less likely that Brown had the requisite reading, verbal and other skills necessary to appreciate the abstract concepts of his *Miranda* rights and the consequences of waiving them. The evidence offered by the State in this regard in no way contradicts the salient and undisputed facts con-

cerning Brown's extremely limited intelligence.[8]

Moreover, although the State did not even attempt to argue this point, the Court finds that even if the trial court's statement that it would not accept "any implications ... in terms of that IQ" is considered some sort of factual finding, the Court must conclude that this finding is not entitled to a presumption of correctness, because it is not fairly supported by the record as a whole. *See* 28 U.S.C. § 2254(d)(8). As the state trial prosecutor himself plainly conceded and as the trial court . expressly found, Dr. Koprowski's testimony was unimpeached. Pet Ex. 1006C at 421, 442–43. This testimony makes absolutely clear that the fact that Brown's IQ was between 54 and 58 classified him as mildly retarded and places him in the very lowest 1% of the population, intelligence-wise. The state court record is virtually undisputed in this case that Brown had a mental age of 7 or 8, as his reading, writing and mathematical abilities were at or below a 3rd grade level. Pet. Ex. 1006(B) at 188. There is simply nothing in the record presented to the state court, including the record concerning Brown's poor performance and attendance at school, which contradicts *any* of this testimony. Thus, there is simply no basis in the record as a whole for "not accepting any implications" concerning Brown's extremely limited intelligence.

Accordingly, the Court finds, based on its careful review of the record, that the subsidiary factual findings concerning Brown's extremely low IQ and Brown's poor performance and attendance at school are entitled to a presumption of correctness, and that these facts weigh against a finding of a valid waiver under the totality of the circumstances analysis. *See, e.g., Cooper,* 455 F.2d at 1146 (determining two juveniles with IQs between 61 and 67 did not knowingly waive *Miranda* rights). The Court additionally finds that even if the trial court's refusal to accept "any implications... in terms of that IQ" was somehow deemed a factual finding, this finding is not entitled to a presumption of correctness, as it is not fairly supported by the record as a whole.

**2. The Trial Court's "Mental Capacity" Finding Is Not Entitled to A Presumption of Correctness**

The trial court found that Brown had the "mental capacity to understand his *Miranda* warnings that were given him." *Id.* at 442–443. It must be noted that Brown's "mental capacity," while relevant, is not the pertinent constitutional standard for reviewing a *Miranda* waiver, as the ultimate question the Court must answer is not one of Brown's mere capacity to understand, but whether Brown actually understood the nature of his rights, and the consequences of waiving those rights, on July 16, 1991.

As with its argument concerning the trial court's "rejection" of Brown's IQ assessment, the State primarily maintains that the trial court's "mental capacity" finding amounts to an adverse determination as to Dr. Koprowski's credibility, and thus that this Court must reject the doctor's testimony in the entirety. The Court disagrees. First, the case cited by the State, *Bottoson v. Moore,* 234 F.3d 526 (11th Cir.2000), does not support this position, as *Bottoson* holds only that "where

8. Moreover, as discussed more fully below, Dr. Koprowski's testimony is consistent with the overwhelming testimony presented during these federal proceedings concerning Brown's serious intellectual deficit. Specifically, as discussed below, the testimony of Timothy Brown, Othalean Brown, Douglas Bell, Donald Craig, and Dr. Lenore Walker confirm and corroborate Brown's extremely limited intelligence through convincing evidence.

there is conflicting testimony by expert witnesses, discounting the testimony of one expert constitutes a credibility determination." *Id.*, 234 F.3d at 534. Here, there was no "conflicting testimony by expert witnesses." Moreover, as noted above, the Court cannot conclude that the trial court must have rejected the doctor's testimony, especially in view of the trial court's express adoption of the doctor's crucial testimony that Brown's IQ level was between 54 and 58 in 1991, and the trial court's specific finding that "the state did not impeach the doctor." Pet. Ex. 1006C at 416, 441–43.

Dr. Koprowski testified that Brown "*would have* the ability" to understand "legal rights" in a "very, very basic way," Pet Ex. 1006(B) at 190 (emphasis added), and that Brown knew that a lawyer was a "person who was on his side." *Id.* at 231. The State submits that this testimony is somehow conclusive evidence of Brown's actual understanding of his core *Miranda* rights to have an attorney present at interrogation, and of the consequences of waiving those rights.

The Court finds that the testimony that Brown would have the potential ability to understand his rights in a very basic way, and that he understood that a lawyer was a "person who was on his side," is very different from saying that Brown actually understood his *Miranda* rights when he waived them, based upon the actual warnings given to him and the manner in which they were administered. At best, the record merely supports the proposition that Brown "would have the ability" to understand *some* of his rights, provided he was given extra help.[9]

Therefore, after carefully reviewing the state court record, the Court concludes that the trial court's finding that Brown had the "mental capacity to understand the *Miranda* warnings given him" is not fairly supported by the record as the whole under 28 U.S.C. 2254(d)(8), and is not entitled to a presumption of correctness. Moreover, even if presumed correct, the finding that Brown had the "mental capacity to understand the *Miranda* warnings given him" cannot be accorded significant weight for purposes of determining the validity of Brown's waiver, as it was not accompanied by any findings concerning whether the warnings actually given to Brown were themselves adequate, or were given in a manner which would allow for the requisite understanding. These important factors, not addressed by the trial court, are discussed below.

### 3. The Manner in Which the Rights Were Administered to Brown Weighs Against a Finding of a Valid Waiver

Although substantial evidence was presented at the suppression hearing concerning the manner in which the *Miranda* warnings were administered to Brown, the trial court made no specific factual findings in this regard. As set forth more fully above, Detective Carr testified that upon locating Brown outside the Covenant House at 6:20 p.m. on July 16, 1991, outside of the presence of HRS workers, Detective Carr immediately placed Brown under arrest, placed him in the police car, and read Brown his rights from BSO's standard issue card. Pet. Ex. 1006(B) at 266–277.

Detective Carr testified that he arrived with Brown at the parking lot of the station at 6:55 p.m. Once in the station,

---

**9.** As discussed more fully below, the trial court made no findings, and the record does not otherwise reveal, that any steps were taken to assure that Brown understood his rights, other than the cursory reading of a form which itself did not fully and properly apprise Brown of all his rights.

Brown went to the bathroom and was then situated in an interrogation room. *Id.* at 274–277; Pet. Ex. 1006C at 367–68. In the interrogation room, Brown was given a soda, and the detectives shackled Brown's feet with leg irons. *Id.* at 281–282. Detective Carr also testified that at one point, he and Detective Thomasevich briefly left the room. *Id.* at 274–277. Finally, once the Detectives returned to the interrogation room, Detective Carr then read Brown his rights from BSO's standard juvenile waiver of rights form, Brown wrote "Yes" and "No" after the various questions on the form about those rights, and signed the waiver by 7:10 p.m. Pet. Ex. 1006B at 276–279. Interestingly, the entire process of situating Brown once he arrived at the station, using the restroom, shackling him, reading the rights to Brown, filling in the responses, and obtaining Brown's waiver lasted less than 15 minutes from the moment of arrival at the station.

The Court is particularly concerned about the timing and perfunctory manner in which the rights were explained to Brown, in view of the testimony that BSO specifically decided to arrest Brown at a time when HRS workers would not be around to invoke his rights for him. Pet Ex. 1006(A) at 26. The Court is also concerned that no steps—other than the cursory reading of the form—were taken to assure that Brown, a mentally retarded juvenile, understood his rights. As discussed above, Sergeant Scheff testified that he was concerned not only that Brown was under the influence of narcotics on November 15, 1990, but that he may have been suffering from some sort of "organic brain dysfunction," or was at the very least "clearly not in possession of all his faculties." Pet. Ex. 1006(A) at 31, 125. Detec-

tive Scheff's observations likely emanated from Brown's undisputed mild mental retardation. Further, Sergeant Scheff conceded that one of his concerns during his prior encounter with Brown was that Brown appeared extremely suggestible. *Id.* at 124–126.[10]

Given these clear warning signs, the Court cannot accept the State's argument that Brown's waiver was valid merely because BSO detectives testified that Brown "appeared" to understand what they were saying to him in the mere fifteen-minute interval before he signed the waiver form, or that Brown's waiver was valid merely because Brown ultimately signed the form and "reconfirmed his knowledge" of the *Miranda* rights on the taped statement subsequently made by him. D.E. 333, at 25–26; 36. Similarly, at the suppression hearing, the State's case for Brown's understanding of his rights also boiled down to the fact that he signed the *Miranda* waiver form.

As a general matter, "[a]n express written or oral waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but it is not inevitably either necessary or sufficient to establish waiver." *North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). Given the circumstances discussed herein, the Court is not persuaded that Brown's signing of the *Miranda* form and his responses to questions therein are conclusive of Brown's actual understanding of his rights.

First, consistent with Supreme Court case law, the mere "recitals" of a mentally retarded 15–year old as to his understanding of his constitutional rights has little weight, particularly where there is other

---

**10.** While the trial court found that Brown was not intoxicated on July 16, 1991, the trial court made no findings and did not otherwise address the other possibility identified by Detective Scheff as to Brown's suggestibility, namely that Brown may have been suffering from some sort of organic brain dysfunction.

evidence indicating a lack of understanding. In *Haley v. Ohio*, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948), the Supreme Court rejected an argument similar to the State's argument in this case that Brown's recitals on the form are somehow conclusive of the issue of waiver, stating:

> [W]e are told that this boy was advised of his constitutional rights before he signed the confession and that, knowing them, he nevertheless confessed. That assumes, however, that a boy of fifteen, without aid of counsel, would have a full appreciation of that advice and that on the facts of this record he had a freedom of choice. We cannot indulge those assumptions. Moreover, we cannot give any weight to recitals which merely formalize constitutional requirements. Formulas of respect for constitutional safeguards cannot prevail over the facts of life which contradict them.

*Id.* at 601, 68 S.Ct. 302.

In addition, several courts have held that the fact that a juvenile suspect has a sub-normal IQ, and that the rights are merely read to the suspect verbatim, without the concepts being carefully or fully explained, or the suspect's answers being explored, weighs very strongly against a finding of waiver. For instance, in *Smith v. Kemp*, the expert testified that the defendant with an IQ of 65 and mental abilities in the lowest 2% of the population would possibly have understood a *Miranda* warning if it were properly explained to him, but the police did not take that time and did not provide the necessary explanation. *Smith*, 664 F.Supp. 500, 504 (M.D.Ga.1987), *aff'd*, *Smith v. Zant*, 887 F.2d 1407 (11th Cir.1989). In the absence of that explanation, the district court found that the defendant, whose mental abilities were equivalent to that of a 10–year old child, did not knowing and intelligently waive *Miranda* rights and was entitled to habeas relief. *Id.* On appeal, an equally divided *en banc* Eleventh

Circuit affirmed the district court's decision. *See Smith*, 887 F.2d at 1407.

Likewise, in *Henry v. Dees*, 658 F.2d 406 (5th Cir.1981), the Fifth Circuit affirmed the granting of habeas relief to a petitioner who was an educable mental retardate with an IQ between 65 and 69, and whose reading skills were at the second grade level. As the Fifth Circuit explained:

> When persons of markedly limited mental ability such as Henry, are questioned without the aid of counsel, issues of 'suggestibility and possible overreaching are raised' . . . Extra precautions must be taken. It must be painstakingly determined that they comprehend what events are transpiring. In addition, the presence of counsel should be assured absent an unmistakable, knowing waiver of that assistance.

*Henry*, 658 F.2d at 411. *See also Cooper*, 455 F.2d at 1146 (rejecting argument that 15 and 16–year old brothers with IQs between 61–67 and 2nd or 3rd grade reading levels merely "appeared" to understand rights). In this case, Brown's IQ was materially lower, and his intelligence even more limited, than that of the defendants in each of the above cases.

The State gives no reason for why the Court should ignore this case law indicating that the perfunctory reading of a rights form, without any further explanation, to a mentally retarded juvenile, is a factor which weighs against a finding of waiver, or for instead crediting in favor of the decision in *United States v. White*, 451 F.2d 696 (5th Cir.1971). Here, as discussed more fully below, the juvenile statement of rights form used by BSO did not advise Brown of his rights in any detailed manner, and the form included a space next to each question for Brown to merely provide a "yes" or "no" response, without more. Detective Carr read the form quickly to Brown without providing any

explanation of those rights and without exploring Brown's responses in any way. Indeed, while the State argues that Brown "reconfirmed his knowledge" of his rights on his July 16, 1991 taped statement, the tape recording clearly demonstrates that Detective Carr read the rights to Brown in an extremely cursory fashion, and on at least one occasion, did not even provide Brown with a chance to answer the question before moving on to the next question.

Unlike the circumstances presented above, in *White* the defendant was not a juvenile, and while the defendant there claimed he had a "below average IQ," there is no indication in the record what that IQ actually was, or whether it came even close to Brown's extremely low IQ of 56. *Id.,* 451 F.2d at 700–701. Moreover, unlike the case at bar, in *White* the court found it significant that the defendant testified at trial "as to the events [in connection with the reading of the rights] and indicated an understanding of those rights." *Id.,* 451 F.2d at 700.

Similarly, the State provides no reason why this Court should rely on certain decisions in other circuits, including *United States v. March,* 999 F.2d 456 (10th Cir. 1993), where the defendant was neither a juvenile nor had an IQ which placed him in the mentally retarded range, or *Henderson v. DeTella,* 97 F.3d 942 (7th Cir.1996), where the defendant was not a juvenile and actually evidenced an understanding of his rights by declining to make a statement on his first encounter with police, or *Correll v. Thompson,* 63 F.3d 1279 (4th Cir.1995), a case which also did not involve a juvenile defendant.

While the trial court did not address any of the case law set forth above in his findings, it did appear to rely on certain unnamed cases "referring to children as young as ten years old IQ's may be a little bit higher I think 68, 69, 70 someplace in that area, but it was a ten year-old as opposed to a 15 year old, and that wasn't sufficient enough to suppress the statement." Pet. Ex. 1006C at 442. However, neither the parties nor the Court could identify any such pertinent precedent, involving circumstances such as those present in this case, that would be controlling.

The Court, having considered the state court record, the absence of any specific findings by the trial court on this issue, and the pertinent federal law, finds that without any explanation of the rights, or any inquiry into Brown's responses, Brown's "Yes/No" responses, the recitals of a 15-year old juvenile with an IQ between 54 and 58, in response to the perfunctory reading of the rights form, are not sufficient to establish the requisite understanding required for a constitutional waiver.

Rather, the Court finds that the record concerning the cursory reading of the rights form to Brown, a mildly retarded juvenile, in a remarkably swift process wherein a waiver was obtained within fifteen minutes from the moment Brown arrived at the station, and wherein no steps were taken to explain the rights to Brown, even though BSO suspected something was "not right" with him, clearly weighs against a finding of a valid waiver. *See Smith,* 887 F.2d at 1434 (noting as a significant factor that no extra steps were taken to explain the rights form to suspect with IQ of 65 and that "the entire process of securing [the] waiver and obtaining his confession took not over thirty minutes at the longest.").

**4. The Actual Warnings Given to Brown Do Not Support a Finding of A Valid Waiver Under the Circumstances Presented Here**

The trial court did not make any specific findings concerning the adequacy of the warnings given to Brown. Obviously, any

determination that Brown knowingly and intelligently waived his rights depends in part on whether Brown's core *Miranda* rights were actually conveyed to him. *Smith*, 887 F.2d at 1430.

As set forth more fully above, Brown was informed of certain rights at the time he was located by BSO near the Covenant House, and then again after he arrived at the station. Detective Carr testified that he read Brown his rights verbatim from the standard issue card used by BSO in 1991, which in pertinent part informed Brown that "you have the right to speak to an attorney and have him here with you *before* the police ask you any questions," and that "[i]f you decide to answer questions now without an attorney present, *you will give up the right to stop answering questions until you speak to an attorney*." Pet. Ex. 1006(B) at 272–273 (emphasis added).

Less than one hour later, Detective Carr read Brown his rights from BSO's standard juvenile waiver of rights form. The juvenile "Statement of Rights" form utilized by BSO in 1991 informed Brown in pertinent part that "You have the right to talk to an attorney and have him here with you *before* we ask you any questions." *See* Pet. Ex. 89. *See also* Pet. Ex. 1006(B) at 276. The rights form also stated that "If you decide to answer my questions now without an attorney present, you will still have the right to stop answering my questions at any time until you talk to an attorney." *Id.* Finally, the rights form advised Brown that "[s]hould you talk to me, anything you say can and will be used in a court of law, either for you or against you." *Id.*

### a. Brown's Right to Discontinue Questioning at Any Time Was Not Reasonably Conveyed to Him

To begin with, the initial warning that Brown would "give up the right to stop answering questions" is not an accurate reflection of Brown's right to cease questioning at any time, as articulated in *Miranda*. "The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned." *Miranda*, 384 U.S. at 445, 86 S.Ct. 1602. Brown was absolutely misinformed in this regard, even though the rights waiver form administered less than one hour later correctly advised Brown of his right to cease questioning. This correction, however, was made without any subsequent explanation or clarification advising Brown to disregard the information incorrectly provided to him less than one hour earlier.

Under these circumstances, the Court cannot conclude that Brown's "core" *Miranda* right "to discontinue questioning at any time" was reasonably conveyed to him. *Smith*, 887 F.2d at 1430 (quoting *Colorado v. Spring*, 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987)). Thus, the Court finds that the contradictory nature of the information being provided to Brown, a mildly retarded juvenile, within the course of a single hour, concerning his right to discontinue questioning at any time, with no clear explanation or subsequent clarification, is a factor the Court may consider, and weighs against a finding of a valid waiver.

### b. Brown's Right to an Attorney Present During Questioning Was Not Reasonably Conveyed to Him

In addition, as noted above, Brown was advised that "you have the right to talk to an attorney and have him here with you *before* we ask you any questions." Pet. Ex. 89 (emphasis added). Although the trial court made no specific findings on

this issue, it must be noted that conspicuously absent from the warnings given to Brown is any specific warning of Brown's right to an attorney *during* questioning. At best, this juvenile rights waiver form, which presumably was intended to make the warnings easier for juveniles to follow and understand, requires Brown, a mentally retarded 15–year old with a mental age of 7 or 8, to somehow infer from the entirety of the form read to him in a cursory manner that he has the right to an attorney not only *before* BSO asks him questions, but *during* that questioning. Again, as the Court in *Miranda* unambiguously held:

> [A]n individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have a lawyer present with him during interrogation.... As with the warnings of the right to remain silent and that anything stated can be used in evidence against him, this warning is an absolute prerequisite to interrogation. No amount of circumstantial evidence that the person may have been aware of this right will suffice to stand in its stead. Only through such a warning is there ascertainable assurance that the accused was aware of this right.

384 U.S. 436 at 471–472, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).[11]

Of course, the Supreme Court has never indicated that *Miranda* requires any precise formulation of the warnings given criminal defendants. "*Miranda* itself indicates that no talismanic incantation is required to satisfy its strictures." *California v. Prysock*, 453 U.S. at 359, 101 S.Ct. 2806. Instead, the inquiry for reviewing

courts is to determine whether the warnings reasonably convey to a suspect his rights as required by *Miranda*. *Id.* at 361., 101 S.Ct. 2806

However, while no "talismanic" language with regard to the precise wording of the warnings is required, several decisions of the Supreme Court have specifically recognized the importance of informing suspects of their right to the presence of counsel *during* custodial interrogation. *See Duckworth v. Eagan*, 492 U.S. 195, 204, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989) (holding that *Miranda* requires, among other things, that "the suspect be informed, as here, that he has the right to an attorney before and during questioning"); *California v. Prysock*, 453 U.S. 355, 359, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981) (holding that warnings were adequate since the defendant "was told of his right to have a lawyer present prior to and during interrogation, and his right to have a lawyer appointed at no cost if he could not afford one"); *Fare v. Michael C.*, 442 U.S. 707, 717, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979) (reaffirming principle that "to use statements obtained during custodial interrogation of the accused, the State must warn the accused prior to such questioning of his right ... to have counsel, retained or appointed, present during interrogation.").

Recently, during the 2001 Supreme Court term, Justices Breyer, Stevens, and Souter wrote separately in *Bridgers v. Texas* to explain that their denial of certiorari in that case should not be viewed as approval of warnings which did not inform a suspect of the right to the presence of counsel *during* questioning. *Bridgers*, 532

---

**11.** Curiously, the version of the rights form used by BSO for adult suspects in 1991 clearly advised suspects of the "right to speak to an attorney before speaking to the police *and [to] have an attorney present during questioning now or in the future.*" *See* D.E. 336 (emphasis advised). It is unclear why a form

used to advise mere juveniles of their *Miranda* rights would be *less* clear, and *less* specific, concerning the essential right to the presence of an attorney at custodial interrogation, than the form used to advise adults of those very same rights.

U.S. 1034, 121 S.Ct. 1995. Specifically, Justice Breyer expressed concern that "the warnings given here say nothing about the lawyer's presence during interrogation. For that reason, they apparently leave out an *essential* Miranda element." *Id.* (emphasis added).

In addition, it must be noted that many of the federal court of appeals, including the Eleventh Circuit Court of Appeals, have recognized the importance of informing suspects that they have the right to have a lawyer present prior to and during interrogation. *See United States v. Contreras,* 667 F.2d 976, 979 (11th Cir.) (warnings adequate where they advised of "right to consult with an attorney prior to questioning, to have an attorney present during questioning, and to have counsel appointed"), *cert. den.,* 459 U.S. 849, 103 S.Ct. 109, 74 L.Ed.2d 97 (1982); *Caparrosa v. Gov't of Canal Zone,* 411 F.2d 956 (5th Cir.1969) (warnings inadequate where they failed to inform of right to counsel present during his interrogation); *Atwell v. United States,* 398 F.2d 507 (5th Cir.1968) (warning inadequate where it "does not comply with Miranda's directive that an individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation"); *Chambers v. United States,* 391 F.2d 455, 456 (5th Cir.1968) (warning did not comply with *Miranda* where it failed to inform defendant that "he was entitled to the presence of an attorney, retained or appointed, during interrogations"); *Windsor v. United States,* 389 F.2d 530, 533 (5th Cir.1968) ("Merely telling him that he could speak with an attorney or anyone else before he said anything at all is not the same as informing him that he is entitled to the presence of an attorney during interrogation and

that one will be appointed if he cannot afford one"). *See also United States v. Bland,* 908 F.2d 471, 474 (9th Cir.1990) (warnings inadequate since they did not advise of right to have an attorney present during questioning); *United States v. Anthon,* 648 F.2d 669, 673 (10th Cir.) (warnings inadequate since they did not advise of right to have counsel present during questioning and of right to have attorney appointed), *cert. den.,* 454 U.S. 1164, 102 S.Ct. 1039, 71 L.Ed.2d 320 (1982).[12]

Ultimately, this case does not merely involve review of the adequacy of the warnings used by BSO in 1991. Thus, it is not necessary for the Court to decide in this case whether the warnings given by BSO in 1991, which failed to specifically advise juveniles of the right to consult with an attorney during questioning, were *per se* inadequate or constitutionally defective. Rather, the Court's inquiry, and indeed, Brown's claim for relief itself, involves the related and larger question of whether Brown's waiver of his *Miranda* rights was knowing and intelligent. The adequacy of the warnings given, of course, are but another factor in this analysis.

In this case, the warnings given to Brown did not clearly advise him of his "core" *Miranda* right to "talk only with counsel present," e.g., during questioning, or to "discontinue talking at any time." *Smith,* 887 F.2d at 1430 (quoting *Colorado v. Spring,* 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987)). Thus, the Court finds that advising a suspect such as Brown of the right "to have an attorney here with you before we ask you any questions," is simply not the same as advising him of his undeniable right to have an attorney present during that questioning. As such, the Court finds that this factor,

12. *But See United States v. Caldwell,* 954 F.2d 496 (8th Cir.1992) (warning which did not specifically convey right to counsel during interrogation was not invalid *per se* under plain error doctrine).

not addressed by the trial court, strongly weighs against a finding that Brown's waiver was knowing and intelligent.

### c. The Rights Waiver Form Was Misleading as to the Consequences of Brown's Waiver

The Juvenile Statement of Rights form used by BSO also advised Brown that "should you talk to me, anything you say can and will be used in a court of law, either for you or against you." Pet Ex. 89. As set forth above, the Court in *Miranda* was emphatic that "the warning of the right to remain silent must be accompanied by the explanation that anything can and will be used *against* an individual in court." *Miranda*, 384 U.S. at 468, 86 S.Ct. 1602 (emphasis added).

Of course, while no particular language is required in the form of the warnings given under *Miranda*, the Eleventh Circuit Court of Appeals has recognized the importance of unequivocally advising a suspect, without contradiction, that anything he says will be used *against* him in court.

For instance, in *United States v. Beale*, the Eleventh Circuit held that a defendant's *Miranda* waiver was invalid because, "by telling [the defendant] that signing the waiver form would not hurt him the [FBI] agents contradicted the *Miranda* warning that a defendant's statements would be used against the defendant in court, thereby misleading [him] concerning the consequences of relinquishing his right to remain silent." *Beale*, 921 F.2d 1412, 1434–35 (11th Cir.1991).

Recently, in *Hart v. Attorney General of the State of Florida*, 323 F.3d 884, 894–95 (11th Cir.2003), the Eleventh Circuit reversed a district court's denial of a habeas petition and granted the petition on the ground that the petitioner did not knowingly and intelligently waive his *Miranda* rights. In that case, Robert Hart was

seventeen at the time of his arrest and was convicted of first-degree murder based largely on an incriminating statement he made to police in which he confessed to being present at the scene of the crime. *Id.* at 884–90. After being brought in for questioning, Hart signed a rights waiver form which correctly advised him of all of his *Miranda* rights, including the right to have an attorney present at any time during questioning, and which plainly warned Hart that anything he said could be used against him in court. *Id.*, at 887–88. The Eleventh Circuit acknowledged that the detectives in that case "went to great lengths to apprize Hart of his rights," and "carefully explained each *Miranda* warning to Hart." *Id.*, at 894.

However, after signing the waiver form, Hart asked to speak with a detective whom he knew and trusted. *Id.* When Hart met with this detective, Hart asked the detective for clarification concerning his rights, and for the pros and cons of having a lawyer. *Id.* The detective responded that the disadvantage of having a lawyer present was that the lawyer would advise Hart to not answer any questions, and further advised the defendant that "honesty wouldn't hurt him." *Id.* Based on these circumstances, the Eleventh Circuit concluded that Hart did not knowingly and intelligently waive his *Miranda* rights, and explained:

> The phrase 'honesty will not hurt you' is simply not compatible with the phrase 'anything you say will be used against you in court.' The former suggested to Hart that an incriminating statement would not have detrimental consequences while the latter suggested (correctly) that an incriminating statement would be presented at his trial as evidence of guilt.

*Id.* at 894.

In this case, the Court finds that the statement in Brown's juvenile rights form

which indicated that "anything you say can and will be used in a court of law, *either for you or against you*" is misleading as to the detrimental consequences of relinquishing the right to remain silent, and is particularly misleading given the circumstances of Brown's mental retardation and the manner in which the rights were administered to him. Indeed, the circumstances here are even more troubling than those in *Hart,* because unlike the situation in *Hart,* in this case the detectives did not "go to great lengths" to carefully explain any of the rights to Brown, a mentally retarded 15 year-old. Moreover, while *Hart* concerned a contradictory statement made by a detective *after* the defendant signed a waiver which plainly advised him that anything he said could be used against him in court, the incompatible language here that "anything you say can and will be used in a court of law, either for you or against you" is contained in the language of the form itself. Accordingly, the Court finds that this factor weighs against a finding of a valid waiver.

### 5. The Totality of the Circumstances Compel the Conclusion That Brown's Waiver Was Not Knowing and Intelligent

Again, the ultimate determination of whether Brown's waiver was knowing and intelligent is a legal inquiry subject to independent review by this Court. *See Miller,* 474 U.S. at 106, 106 S.Ct. 445. Based on the foregoing analysis under 28 U.S.C. § 2254 in this pre-AEDPA case, after applying the appropriate presumptions of correctness to the state court's factual findings, where applicable and fairly supported by the record as a whole, the Court must conclude that Brown has met his burden of establishing that the waiver of his rights on July 16, 1991 was not knowing and intelligent.

In summary, a careful review of the undisputed record before the trial court indicates that at the time Brown waived his rights, he was fifteen years old, and mildly retarded, with a sub-normal IQ between 54 and 58. Brown's performance and attendance in school was also extremely poor, and Brown's reading, writing, and mathematical abilities were at or below the third grade level, thereby indicating that Brown had a mental age of 7 or 8. The record further reveals that BSO knew from its prior meeting with Brown that, at a minimum, something was "not right" with Brown mentally, and yet took no steps to ensure that Brown actually understood his rights, other than a mere cursory reading of the rights form. Instead, Brown's waiver was obtained in an extraordinarily swift manner, as the entire process of situating Brown once he arrived at the station, allowing him to use the bathroom, obtaining a soda for him, placing shackles on him, reading the juvenile rights waiver form to him, filling in the responses, and ultimately obtaining the waiver occurred within fifteen minutes after his arrival at the station. Further, the record before the trial court reflects that Brown was read rights which initially misadvised him of his right to cease questioning, and was then presented with a juvenile rights waiver form which did not clearly apprise Brown, a mildly retarded 15-year old, of his right to the presence of counsel during questioning, and which at best would require Brown, a juvenile with an IQ between 54 and 58, to somehow *infer* from the reading of the form as a whole that his "core" Miranda right "to talk only with counsel present or to discontinue talking at any time" was available to him at all. Finally, the warning that "anything you say can and will be used in a court of law, either for you or against you," was misleading and did not sufficiently apprise Brown of the consequences of relinquishing his right to remain silent.

After considering these circumstances in their totality, the Court holds that Brown has clearly met his burden of showing that the trial court erred in concluding that his waiver was knowing and intelligent. The Court further holds that even if the trial court was presumed correct in somehow finding that Brown had the *capacity* to understand his rights (a finding which in any event is not fairly supported by the record as a whole), Brown's "mental capacity" to understand alone is simply not enough to support a finding of waiver under the circumstances presented here.

Without a proper understanding of his rights or the consequences of their waiver, the Court concludes that Brown's July 16, 1991 post-arrest statement was secured in violation of the Due Process Clause, and that the trial court committed constitutional error in admitting this statement at trial. Because Brown's July 16, 1991 statement was the only meaningful evidence presented against him, Brown is entitled to habeas relief, as his conviction and current custody are unconstitutional.

### 6. Brown Has Also Rebutted The Trial Court's Factual Conclusions With Convincing Evidence

In addition, even if Brown was not able to establish that he was entitled to relief pursuant to 28 U.S.C. § 2254(d) based on an analysis of the record presented to the trial court at the suppression hearing alone, Brown submits that he has also rebutted any possible presumption of correctness accorded to the trial court's factual conclusions with "convincing evidence that the factual determination by the state court was erroneous." 28 U.S.C. § 2254(d) (1995).

### a. The Court May Consider the Evidence Presented At the Evidentiary Hearings

As a preliminary matter, the State maintains that the Court should not consider any of the evidence presented during the evidentiary hearings this Court held in September and October of 2002. The State argues that where, as here, a hearing has been held in state court, the consideration of additional evidence is inappropriate in a habeas proceeding, under *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), as modified by *Keeney v. Tamayo–Reyes,* 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992). The State argues that under *Keeney,* after a state court hearing is held on an issue, a habeas petitioner may receive a federal evidentiary hearing only if the petitioner "can show cause for his failure to develop the facts in the state court action and actual prejudice resulting from the failure." D.E. 333, at 10.

In *Keeney,* the Court held that the failure to develop a material fact in a state court proceeding will be excused and a federal evidentiary hearing *mandated* if the petitioner can show cause and prejudice for the failure to develop a material fact or that a fundamental miscarriage of justice will result from the failure to hold a hearing. *Keeney,* 504 U.S. at 11–12, 112 S.Ct. 1715. Further, *Keeney* only involves whether and when a federal evidentiary hearing *must* be held. In this Circuit, a district court always possesses the discretion to grant a hearing so long as the merits of the constitutional claim are properly before the court. *See, e.g., Burden v. Zant,* 975 F.2d 771, 775–776 n. 13 (11th Cir.1992) ("*Keeney* did not affect a federal court's discretion to hold an evidentiary hearing on material facts not adequately developed in state court, even if the hearing is not mandatory.").

Here, in prevailing on his claim of "actual innocence," Brown amply demonstrated that a fundamental miscarriage of justice would result from the failure to hold a hearing on the merits of Brown's constitu-

tional claims, and it is for this very reason—the concern that a fundamental miscarriage of justice may result—that the Court concluded that a federal evidentiary hearing was warranted in this case. Therefore, the Court concludes that Brown need not additionally show "cause" or "prejudice" under *Keeney* in order for his failure to develop material facts in state court to be excused, as Brown has demonstrated that a fundamental miscarriage of justice may result from the failure to hold a hearing.

Finally, the State argues that the Court must nevertheless limit its inquiry to the record presented at the state court suppression hearing because the evidence presented was not "newly discovered." In support, the State cites to *Hall v. Head,* 310 F.3d 683 (11th Cir.2002), and *Isaacs v. Head,* 300 F.3d 1232 (11th Cir.2002), both of which are *post*-AEDPA cases interpreting and applying the newly-enacted 28 U.S.C. § 2254(e)(2). Brown's case, as set forth above, is not governed by the AEDPA, and as such the State's reliance on those cases is misplaced.

Rather, once a district court decides in its discretion to conduct an evidentiary hearing, neither *Keeney* nor *Townsend* limit or otherwise refer to the type of evidence the district court may consider, and do not govern the burden of proof at a hearing. Rather, *Keeney* itself made clear that the burden of proof—a separate and distinct issue from the issue of *whether* to hold a hearing at allis governed by the terms of 28 U.S.C. § 2254(d)(1995). For its part, the State never once references the terms of 28 U.S.C. § 2254(d)(1995). Thus, the Court concludes that it may consider the evidence presented during these proceedings to determine whether, under 28 U.S.C. § 2254(d), Brown has presented "convincing evidence" that any factual determination made by the trial court was erroneous.

**b. Brown has Rebutted Any Applicable Presumptions of Correctness Through Convincing Evidence**

Even if the trial court's finding that Brown "had the mental capacity to understand the rights given to him" was presumed correct, and even if the trial court's analysis was not otherwise deemed deficient, the Court finds that through the overwhelming evidence presented during the federal habeas proceedings, Brown has demonstrated that the trial court erred in concluding that Brown's waiver was knowing and intelligent.

During the federal hearings, several witnesses testified that Brown could not possibly read or understand the rights waiver form he signed in 1991. First, Brown himself plainly told the Court that he did not read the form on July 16, 1991—and could not have read it. E.H. Vol. 11 at 14. His mother, Mrs. Othalean Brown, testified that her son "didn't read or write very [well] either." E.H. Vol. 11 at 52.

Brown also presented the testimony of Mr. Doug Bell, Brown's special education teacher at the Broward County Jail beginning in September of 1991, only two months after Brown's arrest, until 1993, when Brown was convicted. *See* E.H. Vol. 12 at 8–15. Mr. Bell is the single witness in this case with the best vantage point—both temporally, and due to his extensive contact with Brown on the specific issue of reading—to testify regarding Brown's mental abilities at the time of arrest. Mr. Bell has four different degrees, 14–years experience as a special education teacher with the Broward County School system, and all the required licenses and certifications. *Id.* at 7–19.

Mr. Bell testified that he was required by the school system to see his special education students, including Brown, five days a week. On each of these visits, he would spend from a half an hour to an

hour with Brown, depending upon how much work Brown could handle. *Id.* at 10–11.

Mr. Bell testified that he would try to work with Brown on "basic things like reading, writing and arithmetic to get back to the three Rs." *Id.* at 10. But, as Mr. Bell stated, Brown "had a great deal of difficulty reading. I thought that he was at the grade two or three level. It was very limited. He needed a lot of help." *Id.* at 11. As to the type of words he was working with Brown on during this time period, Bell explained: "Well, initially, we tried something a little beyond him and then had to back off into early reading programs. So, we are talking four or five letter words." *Id.* at 12. And that was "one word at a time." *Id.* at 12. Mr. Bell recalled that Brown had a "very limited mental capability. Didn't comprehend things very well or understand." *Id.* at 12. When the Court asked Mr. Bell if there was "any way to quantify the level of understanding," Mr. Bell explained that Brown's understanding was "Well, very simplistic. He had to have things explained to him very carefully over and over again before he could grasp it." *Id.* But it was not only the inability to grasp or understand, but rather Brown's extreme child-like behavior at age 15—his obsession with coloring—which Bell was able to describe in a concrete way. As Mr. Bell testified:

> [A]t that time he was fifteen, sixteen, seventeen when I was seeing him, in that range, and I thought he was really at a grade two or three level, which would be the eight or nine age level. When he didn't want to do a lot of work, the best I could get him to do was puzzles, maze-type puzzles and a maze-type thing, and he liked to color.
>
> I would leave work behind so he could color and offer him some pencil or crayons they were allowed to use . . . .

> I looked forward to seeing him and I think he looked forward to me coming by.
>
> I know he was quite perturbed on days sometimes when I didn't get by or didn't bring the colored pencil he asked for, or something like that.

*Id.* at 12–14.

In addition, Petitioner presented the testimony of Donald Craig, who met Tim Brown in Avon Park Correctional in 1993, and prepared his initial habeas petition. *See* E.H. Vol. 11 at 65–76. Mr. Craig testified that even when Brown arrived at Avon Park Correctional in 1993, even after all of the time spent with Doug Bell at the Broward County Jail, Brown still could not read anything complicated or with any sort of understanding. *Id.* at 70.

Detective Carr also testified during the federal evidentiary hearings, and stated that "[Brown] indicated that he was reading the form and *he read it out loud to me* and appeared to understand everything." E.H.9 at 90. It is unclear why Detective Carr failed to mention this presumably crucial fact—that Brown read the form out loud—in any of his prior testimony at the suppression hearing or at trial, where he maintained that he had merely read the form out loud to Brown, and that Brown had read along with him *silently*. Pet. Ex. 1006(B) at 278; Pet. Ex. 1006(L) at 1727. In addition, Detective Carr's testimony concerning Brown reading the form out loud is different from that of his former partner, Detective Thomasevich, who was in the room at the time the rights waiver form was read to Brown and who testified that "I know he had to print his name on the form, on the rights waiver form, and sign his name. I assumed if he was able print and sign his name, he was in fact, able to read." E.H. Vol. 13 at 86. This is not a reasonable assumption to make when dealing with a mentally retarded juvenile.

The State also argues that the Court should not believe Brown's testimony, or that provided by Mr. Bell or Mr. Craig, because the Court itself heard from Brown during the evidentiary hearings, and "Brown was cogent and there did not appear to be anything that Brown could not comprehend, or where he was unsure of a question, competently request clarification before answering." D.E. 333, at 32. Of course, when Brown testified before this Court he was a 26 year-old adult, and not a 15 year-old juvenile, and more than eleven years has elapsed since the July 16, 1991 statement.

Finally, Brown presented the expert testimony of Dr. Lenore Walker, was testimony was unimpeached. Dr. Walker reviewed both Dr. Koprowski's IQ testing and Tim Brown's school records—and also concluded that at the age of 15, Brown was mildly retarded and most definitely could not have read or understood the *Miranda* rights waiver form used by BSO in 1991. Pet. Ex. 1048 at 58.[13] As previously set forth above, Dr. Walker explained:

> Mildly retarded, by the way, doesn't mean what the English translation means. It is a term of art that a psychologist uses.... Mildly retarded is pretty severe. You can't learn in a regular classroom if you are mildly retarded. But it differentiates from moderate or severely retarded people that can't be left alone.

Pet. Ex. 1048 at 54.

Dr. Walker reviewed Brown's various testing scores, and explained that "he was functioning [as] about a seven year old or eight year old." Pet. Ex. 1048 at 32, 46–47, 71. Dr. Walker explained that part of the difficulty with a person such as Brown's ability to comprehend *Miranda* rights is that the legal concept of a

"right"—any "right"—is an abstract concept, and as a general matter abstract reasoning only becomes possible beginning at the age of about 11 or 12. Pet. Ex. 1048 at 62–63 (noting that "[i]f [Brown] has a mental age of seven or eight, he's nowhere near the eleven or twelve year olds where you first start to use abstract concepts."). Dr. Walker opined that Brown could not have attained the requisite ability to think abstractly in July of 1991, because Brown needed to think abstractly to do math, and "his math is even worse than his reading and spelling—somewhere between first and second grade in math. We really see a boy who just doesn't have that ability." Pet. Ex. 1048 at 63.

Dr. Walker also testified that the rights waiver form itself was confusingly worded with compound questions, and it required not only thinking about abstract constructs, but also fairly advanced "sequential" thinking, which someone at Brown's IQ level would be incapable of doing. "With somebody with that low IQ, you have to say one thing, get your answer, then go to the next thing, get your answer. You can't give a compound question.... Otherwise, there's no understanding of it." *Id.* at 53. Specifically, with respect to the rights waiver form, Dr. Walker opined:

> So, for example, in the beginning of this statement it says "Are you comfortable?" That's one statement, he says yes. The second one, "Can you read and write the English language?" That is two things; read and write. Further down you have three, "you have the right to remain silent. That is you don't have to talk to me or answer any questions if you don't want to. Do you understand?" That is too much already for someone with the IQ in the mid

---

**13.** Pursuant to the Court's instructions to the parties, expert testimony was presented via deposition.

fifties to hold this in their head before they answer it. . . .

*Id.* at 59–60.

Dr. Richard A. Leo, another expert witness offered by Brown, explained that because the mentally retarded do not have the ready ability "to understand the *Miranda* warnings as they are stated," the necessary way to administer the *Miranda* warnings with mentally retarded individuals is to go through the rights set out in the form extremely slowly; stop at the end of each one; ask if he understands; ask him if he can give an example of what it means, and to restate what it means. *Id.* at 43–44.

As this Court has noted above, the importance of taking such precautions with juveniles with sub-normal IQs is well-recognized in the case law. *See Smith,* 887 F.2d at 1432–1433; *Henry,* 658 F.2d at 411. Moreover, BSO itself now recognizes the need for such precautions in its new policies for interrogating developmentally disabled suspects, and now understands that something more than a quick read-through is necessary for developmentally disabled subjects. *See* Pet. Ex. 82 at 2 ("When advising developmentally disabled subjects of their constitutional rights, detectives will speak slowly and clearly and ask subjects to explain their responses rather than simply answer yes or no.").[14]

Finally, the evidence presented during the federal proceedings confirms that Brown was extremely suggestible, and simply did not understand his rights and the consequences of his decision to go along with BSO's questioning on July 16, 1991. Both Dr. Koprowski and Dr. Walker indicated that based on Brown's prior experience, Brown believed that if he told them what they wanted to hear, "it would be over," and he could "go on" or "go

home" as before. Pet. Ex. 1006(B) at 240; Pet Ex. 1048 at 40–45.

Indeed, based on his prior experience with the law in the juvenile system, this was the only frame of reference Brown had. Although on a few occasions he would have to spend some time in the juvenile detention center, nearly every other time he had been arrested, Brown would call his mother, and she would come to get him and bring him home. E.H. Vol. 9 at 51–52; E.H. 11 at 18. Ron Nobles, Assistant Superintendent at the Detention Center, testified and confirmed that this is the standard procedure at the detention center where Brown was previously processed. E.H. 12 at 77–78.

On this point, the State contends that Brown's prior experience supports the trial court's conclusion of a valid waiver, and argues that the "fact" that Brown was read *Miranda* rights before July 16, 1991 would "auger against the opinion that he did not understand his rights . . . in July 1991 unless they were read slowly and in short sentences." D.E. 333, at 45. In support of its argument, the State sought to introduce a transcript of a taped statement made by Brown on May 5, 1991 where, in connection with a juvenile matter, Brown indicated that he was read his "rights." Resp. Ex. 1001. The State, however, has not submitted the actual May 5, 1991 *Miranda* form which was allegedly read to and initialed by Brown. Without this actual waiver form, the "recitals" in Resp. Ex. 1001 are not complete, as the Court has no way to judge which "rights," if any, Brown was actually advised of in May of 1991. Nonetheless, Brown's objection to the introduction of Resp. Ex. 1001 is overruled. Even considering the evidence as submitted, the Court finds that the State has not demonstrated through competent evidence that Brown was previ-

---

**14.** Of course, because BSO's new policy came into effect years after Brown's July 16, 1991 interrogation, the present policy has no bearing on the issues at hand.

ously read his *Miranda* rights, such that he would have the requisite understanding of his rights on July 16, 1991.

Moreover, as indicated in *Smith*, where a juvenile with subnormal IQ is read his *Miranda* rights in a cursory manner and without careful explanation, the fact that the defendant might have had previous encounters with the law may be relevant in determining whether a waiver is valid, but it is not "particularly important" in every case. *Smith*, 887 F.2d at 1434. *See also T.S.D. v. State*, 741 So.2d 1142 (Fla. 3rd DCA 1999) (holding juvenile with 62 IQ, who read at 3rd grade level did not knowingly and intelligently waive his right to remain silent and that prior exposure to the juvenile system did not aid in his comprehension of *Miranda* rights). Here, in light of Dr. Koprowski testimony that "based on his prior experience, [Brown] did not fully understand he could have had an attorney present," (Pet.Ex. 1006(B) at 191), and the other convincing testimony presented to this Court, the Court concludes that Brown's prior experience does not necessarily weigh in favor of a valid waiver.

Therefore, in addition to prevailing on his *Miranda* claim based on the record before the state court alone, Brown has demonstrated through the overwhelming and convincing evidence presented in these proceedings that the trial court's factual conclusion concerning Brown's mental capacity, and its ultimate determination of a knowing and intelligent waiver, was patently erroneous. For these reasons, Brown has further met his burden of proving that the trial court committed constitutional error.

## II. BROWN'S CLAIM THAT HIS CONFESSION WAS NOT VOLUNTARILY GIVEN

In Ground B of the Amended Petition, Brown claims that his July 16, 1991 state-ment was not voluntarily given and was coerced in violation of his fifth amendment due process rights. As with the waiver inquiry, the Court must apply a presumption of correctness to the state court's factual findings, where applicable and fairly supported by the record as a whole. However, the ultimate issue of voluntariness is a legal question requiring independent federal determination. *Miller v. Fenton*, 474 U.S. at 106, 106 S.Ct. 445.

■ As the Supreme Court has made clear, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). Absent police overreaching which is causally related to the confession, "there is simply no basis for concluding that a state actor has deprived a criminal defendant of due process of law." *Id.*, 479 U.S. at 164, 107 S.Ct. 515.

■ Beyond the necessary and crucial element of police coercion, courts look to both the characteristics of the defendant and the circumstances of the interrogation in considering whether the confession is voluntary. *See, e.g., Withrow v. Williams*, 507 U.S. 680, 693–94, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993)(concluding that the voluntariness of the confession depends upon the totality of the circumstances, including the crucial element of police coercion, the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health, as well as "the failure of the police to advise the defendant of his rights to remain silent and to have counsel present during the custodial interrogation.").

The trial court did not make any detailed findings with respect to the voluntariness inquiry, other than finding that (1) Brown was not intoxicated on July 16,

1991; and (2) parental notification was not an issue, as Brown's case did not involve the situation presented in *Stokes v. State,* 371 So.2d 131 (Fla. 1st DCA 1979), where there was a "concern about the parent going to the police station and not having an opportunity to be with the defendant." Pet Ex. 1006C at 442.

■ The Court having carefully reviewed the trial court record finds that some of the circumstances surrounding Brown's interrogation weigh in favor of a finding of voluntariness. For instance, the trial court record reveals that the interrogation was very brief, and lasted only 80 minutes. Only two detectives, Carr and Thomasevich, were in the room during the interrogation. Brown was afforded certain creature comforts, as he was given a soda and was allowed to use the restroom.[15] Brown's handcuffs were removed during the interrogation, although Brown's feet were shackled with leg irons as a safety precaution against escape, pursuant to BSO's standard procedure. *See generally* Pet. Ex. 1006 at 34–35, 271–79, 367–68.

On the other hand, the record also reveals that some of the circumstances surrounding Brown's interrogation weigh *against* a finding of voluntariness. The Court is particularly troubled that BSO specifically arrested Brown when no adult would be around to invoke his rights, and that BSO failed to advise Brown, a mentally retarded juvenile, of his right to have counsel present during interrogation, even though BSO had reason to know, based on its prior encounter with Brown, that something was "not right" with Brown, and that Brown was clearly "not in possession of all his faculties." Pet Ex. 1006(A) at 125.

However, after considering the pertinent factors as presented to the trial court, the Court finds that the facts in their totality do not give rise to the crucial element of police coercion. Thus, even assuming *arguendo* that the trial court erred in finding that parental notification was not an issue in this case, the Court cannot conclude that the trial court committed constitutional error in determining that Brown's statement was voluntarily given, given the absence of the necessary predicate of coercive police activity.

In addition to relying on the record developed at the suppression hearing, Brown also maintains that pursuant to 28 U.S.C. § 2254(d), he has established through convincing evidence that the trial court's findings were erroneous. In this regard, it is abundantly clear from the testimony presented during the federal evidentiary hearings that the facts concerning what ultimately occurred in the unrecorded "pre-interview" on July 16, 1991 are very much in dispute.

At the evidentiary hearing, Brown claimed that the interrogation room created a coercive environment, and that the officers slapped him and threatened him with the electric chair. Brown also claims that he was not only shackled, but shackled to a chair or the floor. Brown also maintained that after he confessed, Detective Carr punched him. Mrs. Brown testified that when she first saw Brown on July 20, 1991, several days after he made his statement, Brown had a bruise on his nose, a puffy lip, and a cut inside his lip. E.H.9 at 50–60. Detectives Carr and Thomasevich deny that they slapped or threatened Brown, and deny that Brown was shackled to a chair or the floor. E.H.13 34–35, 85–86.

Brown was photographed and fingerprinted after he made his statement on

---

**15.** It appears that Detective Carr stated in the audiotape of Brown's confession that Brown, a juvenile, was also given cigarettes.

July 16, 1991. Brown submits that if the photos are examined closely enough, the photos reveal a slight bruising across the upper right portion of Brown's nose, and a puffy lip. E.H.12 58–61; R–Ex. 16, 17, 1018, 1019. The Court, however, carefully examined the photographs in question and cannot conclude that the photographs reveal any apparent injuries which would support Brown's claim of coercion.

In addition, the records from the juvenile detention center where Brown was taken immediately after his arrest do not indicate that Brown suffered any injury on the night of his arrest and do not support Brown's claim of coercion. Ron Nobles, a 15–year employee of the juvenile detention center where Brown was taken testified as to the procedures generally used in 1991 to book juveniles such as Brown. Under these procedures, an intake officer screens the juvenile to determine whether he qualifies for admission to the center. *See* E.H.12 at 76. The juvenile is then checked for "injuries, bruises or anything." E.H.12 78. Both an intake officer and supervisor then confer to verify that the juvenile has met the criteria for detention and is cleared medically. *Id.* at 78–79, 84. As part of the processing, the juvenile is taken to the showers where a body search is conducted and a "visual picture of the body is done and recorded" to verify there are no injuries which went unreported while the police officer was at the center. *Id.* at 79–81. The intake process lasts about 45 minutes to one hour, after which, the juvenile is placed in a unit. E.H.12 at 80–81. If any injuries are identified, the juvenile is not accepted at the center, and is instead sent to the hospital. *Id.* at 79.

Gregory Mitchell, the case worker who processed Brown into the detention center on July 17, 1991 following his arrest testified that he did not note any injuries or abrasions on Brown's body. *Id.* at 89. Further, it is undisputed that after police officers left the detention center, Brown could have, but did not, complain to detention center staff about any injuries or misconduct by police officers.

Brown also asserts that the police gave him information that they knew to be false concerning Keith King's version of events, and thereby coerced him into admitting his culpability. This tactic, however, in and of itself, does not establish that a confession is coerced. *See Holland v. McGinnis,* 963 F.2d 1044, 1051 (7th Cir.1992) (reasoning that "[o]f the numerous varieties of police trickery . . . a lie that relates to a suspect's connection to the crime is the least likely to render a confession involuntary.").

Brown also maintains that he was coerced because Detective Carr improperly reminded him about Brown's un-Mirandized prior November 15, 1990 statement. However, it is undisputed that the detectives did not represent that the November 15, 1990 statement could be used against Brown. These discussions do not rise to the level of coercion. *See Tankleff v. Senkowski,* 135 F.3d 235, 244–45 (2d Cir.1998) (rejecting assertion that reminding defendant of prior un-Mirandized confession was of such force as to coerce second confession given after *Miranda* warnings).

Brown also contends that BSO's failed to timely contact his mother to notify her that he was being detained, and that the failure to do so is evidence of coercion. Mrs. Brown testified that she was not contacted by BSO until 9:00 p.m. on July 16, 1991, well after Brown had executed his waiver and made a statement to police. Detective Scheff stated that on July 16, 1991, several attempts were made to notify Mrs. Brown, and testified during the suppression hearing that he spoke with Mrs. Brown at length.

■ It is well-settled that the failure to attempt to contact a parent or guardian is a factor in determining the voluntariness

of a confession. *See Doerr v. State,* 383 So.2d 905 (Fla.1980). However, parental notification "is not a statutory prerequisite to interrogation." *Id.* at 908. Rather, the Florida statute in question merely provides that when a juvenile is taken into custody, "the person taking the child into custody shall attempt to notify the parent, guardian, or legal custodian of the child. The person taking the child into custody shall continue such attempt until the parent, guardian or legal custodian of the child is notified or the child is delivered to an intake counselor. . . ." Fla. Stat., § 39.037(2)(1991).

Based on the evidence presented during these hearings, the Court cannot conclude that Brown has met his burden of proving that attempts were not made to contact his mother in accordance with Florida law, or that the failure to make such attempts evidences police coercion.

Brown also argues that on a separate occasion in a separate murder investigation, Detectives Carr and Thomasevich coerced the confession of a suspect named John Wood, and that this evidence supports Brown's claim that he was coerced on July 16, 1991. John Wood is a Vietnam veteran suffering from a severe post-traumatic stress condition and alcoholism. Wood plainly testified that at the time he met with Carr and Thomasevich, he himself believed that it was indeed possible that he committed the crime in question and simply did not remember it, because he occasionally suffers blackouts as a result of his medical condition. E.H.10 at 52–53, 65–67. Thus, given that Wood himself could not rule out that he committed the crime, it is unclear how his testimony compels the conclusion that he was coerced by Detectives Carr and Thomasevich. Moreover, even if Wood's claim of coercion was valid, this testimony does not support Brown's claim that *Brown* was coerced on July 16, 1991.

Finally, with respect to the issue of coercion, on February 14, 2003, the State submitted a Notice of Filing Additional Information, consisting of a Florida Department of Law Enforcement ("FDLE") Report dated January 21, 2003, following the FDLE's examination of the Behan murder investigation. In this Report, the FDLE concluded that there was no evidence of coercion on the part of Detectives Thomasevich and Carr, the lead investigators who elicited Brown's statement, although the FDLE found the detectives's questioning of Brown and Keith King to be "very leading in nature" and that its investigation "did identify several issues that cast serious doubts on the credibility of the lead investigators." D.E. 340. Ultimately, the FDLE recommended in its Report that a task force further investigate the Behan murder investigation.

The State moved to expand the record so that the Court may consider this Report, pursuant to Rule 7 of the Rules Governing § 2254 Proceedings. The Court, however, finds that expanding the record under Rule 7 is inappropriate in this case. Moreover, the Court finds that the FDLE Report, consisting entirely of unsworn hearsay and the conclusory opinions of unnamed FDLE investigators, is not admissible as evidence. While there may be competent evidence in support of the opinions in the Report, it is not before this Court, and this is precisely why courts do not rely upon conclusory opinions, inadmissible hearsay, innuendo, guesswork or supposition to make factual determinations.

Based on the evidence presented during these proceedings, the Court finds that Brown has not met his burden of proving through "convincing evidence" that his statement was the product of coercive police activity, such that the trial court's factual determination was erroneous. As

such, Brown is not entitled to habeas relief based on Ground B of the Amended Petition.

### III. BROWN'S SUFFICIENCY OF THE EVIDENCE CLAIM

In Ground A of the Amended Petition, Brown argues that the evidence was insufficient to sustain his conviction of first degree murder as a principal.

In a habeas corpus proceeding, the standard for review of the sufficiency of the evidence is whether the evidence presented, viewed in a light most favorable to the state, would have permitted a rational trier of fact to find the petitioner guilty of the crimes charged beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). When faced with a record of historical fact that supports conflicting inferences, the court in a federal habeas corpus proceeding must presume that the jury resolved such conflicts in favor of the prosecution, deferring to the jury's judgment as to the weight and credibility of the evidence. *Id.* at 326, 99 S.Ct. 2781; *Wilcox v. Ford*, 813 F.2d 1140, 1143 (11th Cir.1987). The fact that the evidence gives some support to the defendant's theory of innocence does not warrant granting habeas relief. *Id.*

■■■ Section 777.011 (1989) of the Florida Statutes provides as follows:

*Principal in the first degree:*

Whoever commits any criminal offense against the State ... or aids, abets, counsels, hires, or otherwise procures such offense and such offense is committed or is attempted to be committed, is a principal in the first degree...

*Id.* Under Florida law, in order to be convicted as a principal for a crime physically committed by someone else, a defendant must both intend that the crime be committed and do some act to assist the other person in actually committing the crime. Ryals *v. State*, 112 Fla. 4, 150 So.

132 (1933); *Collins v. State*, 438 So.2d 1036 (Fla. 2d DCA 1983).

■■■ Here, the principal piece of evidence linking Brown to the asserted shooter, co-defendant Keith King, was Brown's July 16, 1991 statement. In reviewing this statement for the purpose of determining whether it is sufficient to support a conviction, the Court's inquiry is limited to reviewing whether the statement is sufficient to meet the elements of the crime, and not whether the statement is indeed a true statement, or whether the jury would have convicted Brown had it considered other evidence not in the trial record.

In his July 16, 1991 statement, Brown admitted meeting King on the day of the crime, and stated that the two rode off together on Brown's bicycle. Brown stated that King showed Brown a gun, and as the two rode around on the bicycle, King began to talk about killing someone. In this regard, in the taped statement played to the jury, Detective Carr asked, and Brown answered, as follows:

Q. Okay, and tell me exactly what you recall Keith King saying to you.

A. He gonna kill somebody.

Q. Okay. What do you say to that?

A. I called his bluff.

Q. So you're calling his bluff, you don't believe it?

A. Yes, sir.

Q. Okay, you're basically telling him that you [don't] believe he's got like the nerve to do it?

A. Yes, sir.

Pet. Ex. 1006(M) at 1754. After Brown stated that he "called King's bluff," Brown stated that the two talked about King's plans to kill somebody for about two blocks before they arrived at the Circle K. As they approached the store, King told Brown to look up, and upon seeing the

police cruiser King said "I got him." Brown understood King to mean that the police officer was the person he intended to kill. Brown stated that he saw Deputy Behan inside the cruiser "doing paper work," and also saw him "make a move" before being shot by King. After the shooting, King got back on the handlebars of the bicycle, Brown pedaled the bicycle to the rock pit, and the gun was thrown away. *See* Pet. Ex. 1006(M) at 1746–1768.

Under these circumstances, according to Brown's statement, Brown allegedly pedaled King around on the handlebars of his bicycle, discussed with King a plan to "kill someone," stood by while King approached the police car and shot the deputy, and peddled King away from the scene of the crime to dispose of the weapon. While it is unclear to this Court whether Brown aided and abetted the offense, the Court finds there was sufficient evidence to allow a rational trier of fact to support a conviction as a principal, on an aiding and abetting theory.

Brown nevertheless argues that his explanation that he "called [King's] bluff" should be interpreted to mean that he did not believe King's statement that he intended to kill someone, and so did not have the requisite intent to be convicted as a principal to Behan's killing. This is certainly a plausible argument. The State argues, on the other hand, that the jury could have interpreted the statement to mean that Brown dared King to shoot Behan.

In reviewing a claim for sufficiency of the evidence, deference must be paid to the jury's resolution of conflicting inferences. *Jackson*, 443 U.S. at 326, 99 S.Ct. 2781. Here, the jury resolved the subjective question of what Brown meant by "calling King's bluff" in favor of the prosecution. Although reasonable people may disagree with how the jury resolved the issue, the Court finds that when the pre-

sumption in favor of the jury's resolution of the issue of intent is properly applied, the evidence was sufficient to sustain Brown's conviction as a principal. Accordingly, Brown's Brown's petition for writ of habeas corpus based on Ground A of the Amended Petition must be denied.

## IV. BROWN'S CLAIM THAT THE TRIAL COURT'S STATEMENT TO THE POTENTIAL JURORS DURING VOIR DIRE VIOLATED DUE PROCESS

■ In Ground D of the Amended Petition, Brown asserts that the trial court misinformed the potential jurors during voir dire that Brown faced a life sentence with a minimum mandatory term of 25 years imprisonment, when in actuality, Brown faced a life sentence without the possibility of parole under Florida law. Brown asserts that the trial court's statement is a "clear violation of due process" under *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994). As the Supreme Court recently noted, *Simmons* determined "that when a capital defendant's future dangerousness is at issue, and the only sentencing alternative to death available to the jury is life imprisonment without possibility of parole, due process entitles the defendant to inform the jury of [his] parole ineligibility, either by a jury instruction or in arguments by counsel." *Shafer v. South Carolina*, 532 U.S. 36, 39, 121 S.Ct. 1263, 149 L.Ed.2d 178 (2001) (quotation omitted).

Unlike the situation presented in *Simmons*, the jury in Brown's case played no role in sentencing. Indeed, in his Amended Petition, Brown concedes that "sentencing was not a matter in which the jury had any say." D.E. 70, at ¶ 93. However, the trial court did reference Brown's possible sentence as a preliminary comment to the venire before jury selection commenced,

and noted that "if there's a finding of guilty, the only sentence in the murder in the first degree that would be logical in this case, would be life imprisonment without the eligibility of parole for a minimum mandatory twenty-five years". *See* Pet Ex. 1006(D) at 456, 462. This passing comment was incorrect, as under Florida law, there is no possibility of parole in a case involving the murder of a law-enforcement officer. *See* Fla. Stat., § 775.0823 (1990).

Prior to deliberations and as part of the formal jury instruction, the jurors were instructed: "This case must be decided only upon the evidence that you heard from the answers of the witnesses, have seen in the form of exhibits introduced into evidence and these instructions." *Id.* at 2526–27. The trial court specifically instructed the jury that: "Your duty is to determine if the defendant is guilty or not guilty in accordance with the law. It's my responsibility to determine what a proper sentence would be if the defendant is guilty." *Id.*

 When faced with a constitutional challenge to a jury instruction in a habeas petition, the reviewing court must determine whether the alleged error was of constitutional dimension and if so, whether it was harmless. *Calderon v. Coleman*, 525 U.S. 141, 145–46, 119 S.Ct. 500, 142 L.Ed.2d 521, (1998) (finding that even if sentencing instruction was erroneous, habeas relief is only appropriate if the error had "substantial and injurious effect or influence in determining the jury's verdict") (citations omitted). Under *Boyde v. California*, 494 U.S. 370, 377–380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), a constitutional error exists only where "there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence" or where there is a reasonable likelihood the instruction

was ambiguous and it was reasonable that the jury misconstrued the instruction to prevent consideration of constitutionally relevant evidence. *Id.* at 377–380, 110 S.Ct. 1190. *See Victor v. Nebraska*, 511 U.S. 1, 6, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994). Moreover, in order to grant relief, the erroneous instruction must be tested for its effect upon the jury under a harmless error analysis. *See Brecht v. Abrahamson*, 507 U.S. 619, 637–38, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993); *O'Neal v. McAninch*, 513 U.S. 432, 435–36, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995).

After careful review of the record, the pertinent case law, and the parties' submissions, the Court must conclude that Brown's claim fails because the jury was never instructed to consider that Brown could be paroled after 25 years. Rather, the jurors were correctly instructed to *not* consider Brown's sentence during deliberations. Pet Ex. 1006(Q) 2526–27. While the trial court's preliminary comment during voir dire was indeed inaccurate, this statement does not give rise to a constitutional due process violation. Moreover, even if there was any constitutional error here, the error was harmless, as Brown has not demonstrated a reasonable likelihood that the jury applied the trial court's comment in any which prevented the consideration of constitutionally relevant evidence. Accordingly, Brown's petition for writ of habeas corpus based on Ground D of the Amended Petition must be denied.

## V. BROWN'S INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

In Grounds E through K of his Amended Petition, Brown raises a variety of claims that his sixth and fourteenth amendment rights were violated by the denial of effective assistance of counsel.

## A. The Standard For Evaluating Ineffective Assistance of Counsel Claims

In order for Brown to obtain relief on a claim of ineffective assistance of either trial or appellate counsel, he must show by a preponderance of competent evidence that (1) "counsel's representation fell below an objective standard of reasonableness" and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688–94, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See also Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 1511, 146 L.Ed.2d 389 (2000); *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986); *Chandler v. U.S.*, 218 F.3d 1305, 1312–13 (11th Cir.2000)(*en banc*).

The standard for evaluating "counsel's performance is reasonableness under prevailing professional norms." *Chandler*, 218 F.3d at 1313 (quoting *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052). "The test for ineffectiveness is not whether counsel could have done more; perfection is not required. Nor is the test whether the best criminal defense attorneys might have done more. Instead, the test is ... whether what they did was within the wide range of reasonable professional assistance." *Waters v. Thomas*, 46 F.3d 1506, 1518 (11th Cir.1995) (citations omitted). *See also Burger v. Kemp*, 483 U.S. 776, 789, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987).

Under *Strickland*, "[j]udicial scrutiny of counsel's performance must be highly deferential." *See Bolender v. Singletary*, 16 F.3d 1547, 1557 (11th Cir.1994). Counsel's competence is presumed, and "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the con-

duct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052.

The fact that a particular defense was unsuccessful does not prove ineffective assistance of counsel. *Chandler*, 218 F.3d at 1314. "[C]ounsel cannot be adjudged incompetent for performing in a particular way in a case, as long as the approach taken 'might be considered sound trial strategy.'" *Chandler*, 218 F.3d at 1314 (quoting *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986)). As the Eleventh Circuit elaborated in *Chandler*:

> [A] court must not second-guess counsel's strategy. *Waters*, 46 F.3d at 1518–19 (en banc). By "strategy," we mean no more than this concept: trial counsel's course of conduct, that was neither directly prohibited by law nor directly required by law, for obtaining a favorable result for his client. For example, calling some witnesses and not others is 'the epitome of a strategic decision.' *Id.* at 1512 (en banc); *see also id.* at 1518–19 (en banc); *Felker v. Thomas*, 52 F.3d 907, 912 (11th Cir.1995) (whether to pursue residual doubt or another defense is strategy left to counsel, which court must not second-guess); *Stanley v. Zant*, 697 F.2d 955, 964 (11th Cir.1983) (stating that reliance on line of defense to exclusion of others is matter of strategy).

*Chandler*, 218 F.3d at 1314 n. 14. *See also United States v. Fortson*, 194 F.3d 730, 736 (6th Cir.1999) (denying relief on ineffectiveness claim because reviewing court "[could] conceive of numerous reasonable strategic reasons").

In the event that deficient performance is established, a petitioner also is required to demonstrate prejudice before he is entitled to relief. Prejudice is shown where "there is a reasonable probability that, but

for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

### B. *Analysis of Brown's Ineffectiveness Claims*

In Ground E, Brown asserts that his trial counsel, Larry Davis ("Davis"), rendered ineffective assistance during the suppression hearing because Davis failed to (1) document and argue that Brown was slapped and threatened with the electric chair during the police interview, (2) sufficiently investigate and present evidence of Brown's background, (3) draw connections between Brown's IQ and his ability to waive his *Miranda* rights, and (4) investigate and/or present testimony regarding when BSO contacted Brown's mother to inform her that Brown was in custody.

■ This case does not involve the situation where counsel failed to file a motion to suppress at all, which under certain circumstances, could give rise to a finding of ineffective assistance of counsel. *See Kimmelman,* 106 S.Ct. at 2588. Here, Davis moved to suppress two statements Brown made to BSO. Davis succeeded in suppressing the first statement, and made reasonable arguments in connection with the second statement. Davis obtained the services of a recognized mental health expert, Dr. Koprowski, who conducted the necessary evaluations, and who competently testified at the suppression hearing concerning Brown's background and mental abilities.

Based on a review of the trial court record, the Court cannot conclude that Davis's chosen course with respect to the motion to suppress was objectively unreasonable. While Davis could have investigated other facts and presented additional witnesses or evidence, these matters are matters of trial strategy, and the Eleventh Circuit has made clear that federal courts are not to second-guess matters of strategy so long as the course ultimately chosen was itself not objectively unreasonable. Therefore, because the Court finds that the defense ultimately chosen in connection with the motion to suppress was itself not objectively unreasonable, Brown cannot prevail under Ground E of the Amended Petition.

■ In Ground F, Brown maintains that his counsel was ineffective due to his alleged failure to adequately investigate Brown's chosen defense and star witness, and due to the presentation of an internally inconsistent defense. At trial, the defense's theory of the case was that Brown was not guilty, there was no physical evidence linking him to the scene, there were viable suspects who were not investigated in this high-profile case involving the murder of a BSO deputy, these suspects implicated BSO in an embarrassing sex scandal, and that instead of pursuing these suspects, BSO instead pinned the murder on a poor neighborhood mentally retarded juvenile who was intimidated by BSO detectives into making a statement. Pet Ex. 1006(Q) at 2449–65, 2471–86.

In support of this strategy, Davis investigated Jackie Bain, who made a statement to BSO the day after the shooting that the death of Deputy Behan was a mistake, that the true target was another BSO deputy, and that Curtis McGill was the murderer. Bain gave Davis another suspect to point to, a method for attempting to discredit BSO, and a way of making his client look more sympathetic.

Ultimately, Larry Davis's chosen defense was unsuccessful. However, the fact that a particular defense was unsuccessful does not prove ineffective assistance of counsel, for "counsel cannot be adjudged incompetent for performing in a particular way in a case, as long as the approach taken 'might be considered sound trial

strategy.'" *Chandler*, 218 F.3d at 1314. Here, the Court cannot conclude that the approach taken was objectively unreasonable.

In Ground G, Brown contends that his counsel failed to adequately investigate and present a defense to Brown's taped statement, the only evidence presented against Brown at trial. Brown maintains that counsel should have pointed out factual inconsistencies in Brown's taped statement and should have presented evidence to demonstrate that Brown's confession was false. Brown also submits that Davis should have argued that based on the taped statement, Brown did not have the requisite knowledge to be convicted as a principal, and that counsel erred in effectively conceding this issue in counsel's motion for directed verdict. Similarly, in Ground H, Brown submits that his counsel rendered ineffective assistance in failing to rebut the prosecutor's misleading suggestion that the bicycle seen in the Circle K surveillance video from the night of Deputy Behan's murder was Brown's bicycle.

As set forth more fully above in connection with Brown's sufficiency of the evidence claim, in order to be convicted as a principal for a crime physically committed by someone else, a defendant must have knowledge that a crime is about to be committed and do some act to assist the other person in actually committing the crime. *Ryals v. State*, 112 Fla. 4, 150 So. 132 (1933); *Collins v. State*, 438 So.2d 1036 (Fla. 2d DCA 1983). While Davis did not focus on the element of Brown's "knowledge" that a crime was about to occur, Davis focused on a different aspect of the principal instruction, and whether the State could prove Brown did something in furtherance of the crime. Pet. Ex. 1006(Q) at 2471.

During his closing argument, counsel argued that Brown's statement was coerced because he had a low IQ, that the crime

scene information was fed to Brown, and that the statement—the only evidence introduced against him—should be rejected in its entirety. *Id.* at 2465–71, 2485. Davis offered that the detectives' same tactics had caused a seasoned BSO officer to make inculpatory statements with regard to his involvement in the Circle K sex scandal and that such tactics would have a greater effect on a mentally challenged juvenile. *Id.* at 2465. Davis additionally argued that in the alternative, Brown's statement did not prove the elements of the offense. Davis argued that if the jury determined that the confession was voluntary and to be believed, then it should find that the State had not satisfied the elements under the principal theory, because the State had not shown that based on Brown's statement, Brown "intended to participate actively" in the murder or share in any expected benefit. While the State concedes that Davis did not present evidence or argument concerning factual inconsistencies in Brown's taped statement, the State submits that counsel could have reasonably rejected this approach in order to avoid highlighting consistencies between Brown's taped statement and the evidence introduced at trial.

The Court finds that counsel did not render ineffective assistance in pursuing a strategy which focused on a theory of innocence and on certain aspects of the elements of the principal theory, to the exclusion of other defenses, as the strategy pursued by counsel was itself not objectively unreasonable.

▆▆ Moreover, even if Davis's performance was deficient for the reasons suggested in Grounds F, G and H of the Amended Petition, the Court finds that Brown has failed to establish that there is a "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been differ-

ent." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. Accordingly, Brown's petition for writ of habeas corpus based on Grounds F, G and H of the Amended Petition must be denied.

In Ground I, Brown contends that counsel rendered ineffective assistance in failing to object to the trial court's statement at voir dire that Brown faced a life sentence with a minimum mandatory of 25 years imprisonment, when in fact Brown faced a life sentence without possibility of parole. The jury, however, had no role in determining Brown's sentence, and was expressly instructed *not* to consider the issue of Brown's sentence during deliberations. Pet Ex. 1006(Q) 2526–27. Accordingly, even if Brown has shown that counsel erred in failing to object to the trial court's statement at voir dire, Brown cannot satisfy *Strickland*'s requirement of actual prejudice, as any error in this regard harmless.

In Ground J, Brown asserts that counsel rendered ineffective assistance in failing to move for a new trial based on the newly discovered eyewitness testimony of Edward Davis. Edward Davis stated that he was near the Circle K on the night of the murder, heard a bang, and then saw a man running behind the Circle K. Davis stated that he would have seen, but did not see, two boys riding to or from the Circle K on a bicycle. *Brown,* 229 F.Supp.2d at 1355–56.

As this Court noted in its September 9, 2002, Edward Davis's eyewitness testimony became significant not only because it undermined Brown's July 16, 1991 statement, but because it was consistent with Andrew Johnson's rendition of the events many years later. *Id.* Brown maintains that no reasonable attorney would not have presented Edward Davis as a basis for a new trial.

At the federal evidentiary hearing, Larry Davis testified that he caused his investigator to contact Edward Davis, evaluated his investigator's report, and decided not to present Edward Davis's testimony because he considered Edward Davis to be a reluctant witness, did not find his testimony credible, and did not believe that the trial court would be influenced Edward Davis's statement.

Of course, the importance of Edward Davis's testimony has increased with the discovery of Andrew Johnson's alleged involvement in this matter. *Brown,* 229 F.Supp.2d at 1355–56. However, Larry Davis was not in a position to evaluate the case based upon hindsight. As the Court itself noted in *Strickland,* "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. Accordingly, the Court cannot conclude that the failure to present Edward Davis as a basis for a new trial constituted ineffective assistance of counsel.

Finally, in Ground K, Brown argues that he received ineffective assistance of appellate counsel based on a one-word transcription error on page 1754 of the state trial record. Specifically, the record incorrectly reflects that in Brown's July 16, 1991 statement, Detective Carr asked Brown "Okay, you're basically telling him you believe he's got like the nerve to do it?" Instead, as the audiotape of the statement reveals, Detective Carr had asked Brown "Okay, you're basically telling him you *don't* believe he's got like the nerve to do it?"

Brown maintains that no reasonable appellate attorney would have left this error uncorrected. However, even if the Court were to determine that appellate counsel's

performance was deficient for failing to correct this one-word transcription error, Brown has not satisfied the *Strickland* requirement of showing any prejudice from the failure. While Brown suggests that the omission was sufficiently prejudicial as to undermine confidence in the outcome reached by the state appellate court, this Court is not in a position to speculate about whether the correct transcription would have made a difference to the three-judge panel of the Fourth District Court of Appeal reviewing Brown's direct appeal.[16] Therefore, because the Fourth District Court of Appeal affirmed *per curiam* without written opinion, it is impossible to determine the majority's reasons for its decision, much less to determine whether the correctly transcribed question would have made a difference. Accordingly, Brown's petition for writ of habeas corpus based on Ground K must be denied.

### CONCLUSION

Based on the Court's finding that Brown is entitled to habeas relief under Ground C of the Amended Petition, it is

**ORDERED AND ADJUDGED** that the Amended Petition for Writ of Habeas Corpus is **GRANTED**. It is further

**ORDERED AND ADJUDGED** that the State of Florida is hereby directed to either release Timothy Brown, or retry him within ninety (90) days, in accordance with the Florida speedy trial rule set forth in Rule 3.191(m) of the Florida Rules of Criminal Procedure. It is further

**ORDERED AND ADJUDGED** that the Clerk of the Court is directed to transmit this Order to the Seventeenth Judicial Circuit in and for Broward County, Florida, forthwith. It is further

**ORDERED AND ADJUDGED** that this case is **CLOSED** for administrative purposes, and any pending motions are denied as moot.

---

16. Unfortunately, the majority affirmed Brown's conviction *per curiam* without written opinion. *See Brown v. State,* 657 So.2d 903 (Fla. 4th DCA 1995). Only the dissenting judge, Judge Pariente, wrote an opinion, finding that the evidence was insufficient to sustain a conviction as a principal in the first-degree. *Id.*